*Kelvin Sewell v. State*, No. 2183, Sept. Term 2016
Opinion by Leahy, J.


**Motion to Dismiss > Prosecutorial Misconduct > Evidentiary Hearing**

To warrant an evidentiary hearing on a defendant's claim of prosecutorial misconduct, a defendant must present some evidence, in the form of verifiable facts, that raise a reasonable doubt about *the prosecutor's* motive. *See McNeil v. State*, 112 Md. App 434, 465 (1996).

**Criminal Law > Common-Law Misdemeanors > Official Misconduct**

Although it is a singular offense, the crime of official misconduct covers three modes of behavior: (1) misfeasance, (2) malfeasance, and (3) nonfeasance. *State v. Carter*, 200 Md. 255, 262-63 (1952).

**Criminal Law > Common-Law Misdemeanors > Official Misconduct > Mens Rea**

Regardless what type of act (or omission) forms the basis of a charge of official misconduct, the State must prove that the public officer acted "willfully, fraudulently, or corruptly." *Friend v. Hammill*, 34 Md. 298, 304 (1871); *see also Hiss v. State*, 24 Md. 556, 561 (1866) (relying on Lord Mansfield for the proposition that a justice of the peace may be liable for a discretionary act only if he exercises his discretion "maliciously or corruptly"). This is because official misconduct covers only "*corrupt behavior* by a public officer" in the exercise of his or her duties. *Duncan*, 282 Md. 282 Md. 385, 387 (1978).

**Criminal Law > Common-Law Misdemeanors > Official Misconduct > Mens Rea**

In the case of malfeasance, the conduct in question falls outside of the official's discretion and authority, and, if done willfully, is corrupt on its face. The fact-finder can therefore infer the element of corruption without direct evidence of the official's intent to act corruptly because "wil[l]fulness and bad intent" are "necessary or probable accompaniments" of malfeasance. *See State v. Carter*, 200 Md. 255, 263 (1952). In the case of misfeasance, however, because the conduct normally falls within the official's discretion and authority, the State must present evidence that the official *intended* to act corruptly—with a "sense of depravity, perversion, or taint." Rollin M. Perkins & Roland N. Boyce, *Criminal Law* 542 (3d ed. 1982).

**Criminal Law > Common-Law Misdemeanors > Official Misconduct > Mens Rea**

The measure of what constitutes official misconduct is an imbricating continuum of proof that runs from evidence of conduct squarely within an officer's discretion undertaken with corrupt intent (misfeasance)—to evidence of conduct clearly exceeding an official's scope of authority such that corrupt intent can be assumed (malfeasance).

**Criminal Law > Common-Law Misdemeanors > Official Misconduct > Mens Rea**

The question of corrupt intent in a case for misconduct in office is a question for the trier of fact. *See People v. Hardrick*, 671 N.W.2d 548, 552 (Mich. Ct. App. 2003).

**Criminal Law > Sufficiency of the Evidence > Specific Intent > Proof of Motive**

A defendant's membership in an organization alone, without more, is not competent to prove that the defendant intended to act corruptly in furtherance of that organization's aims. The State must offer admissible evidence specific to the case that tends to establish that the defendant's common membership motivated the defendant to act criminally.

**Criminal Law > Sufficiency of the Evidence > Specific Intent > Proof of Motive**

It is a long-established principle that "[t]he absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction." *Pointer v. U.S.*, 151 U.S. 396, 414 (1894).

**Criminal Law > Admissibility of Evidence > Expert Testimony > Relevance**

When a criminal defendant in Maryland seeks to admit expert testimony, we begin with the baseline that "[t]he criminal defendant is generally permitted to introduce any evidence relevant to the asserted defense." *Simmons*, 313 Md. at 41

**Criminal Law > Admissibility of Evidence > Expert Testimony > Relevance**

A defendant's proffered expert testimony is relevant if it tends to make more probable an element of the defense.

**Criminal Law > Admissibility of Evidence > Expert Testimony > Relevance > Appreciable Help**

Although lay jurors may have first-hand experience interacting with police officers during a traffic stop, they are unlikely to "be aware of the policies and procedures" that a police department has in place regarding the internal handling of investigations, or the broad discretion the officers enjoy in assigning personnel and handling cases.

Circuit Court for Worcester County
Case No. 23-K-16-000289

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2183

September Term, 2016

———————————————————

KELVIN SEWELL

v.

STATE OF MARYLAND

———————————————————

Wright,
Leahy,
Friedman,

JJ.

———————————————————

Opinion by Leahy, J.
Dissenting Opinion by Friedman, J.

———————————————————

Filed: November 29, 2018

* Judge Matthew J. Fader did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

Kelvin Sewell was Chief of the Pocomoke City Police Department (the "Department") from December 2011 to July 2015. Sewell[1] alleged that Pocomoke City terminated him in 2015 for refusing to fire Officer Franklin Savage and Lieutenant Lynell Green. Sewell's termination occurred in the same year that he and Savage filed a series of complaints with the United States Equal Employment Opportunity Commission ("EEOC") alleging various forms of racial discrimination against the Department and, eventually, the Worcester County Sheriff's Department and the State's Attorney for Worcester County.[2]

Following Sewell's termination from the Department, and while his complaints were pending before the EEOC, the State Prosecutor began investigating Sewell's conduct as Police Chief based, in part, on information provided by the State's Attorney for Worcester County. The State Prosecutor looked specifically at Sewell and Green's handling of the investigation into a 2014 traffic incident in which Douglas Matthews, driving home from a meeting at the Prince Hall Masonic Lodge, hit and damaged two unoccupied parked cars. The State alleged that Sewell, a Mason, conspired with Green, also a Mason, to commit the common-law misdemeanor of official misconduct by directing

---

[1] We refer to the parties and witnesses in this case by their last names, generally without honorific, and mean no disrespect thereby.

[2] On January 20, 2016, Sewell, Savage, and Green filed a civil rights lawsuit under 42 U.S.C. § 1981 and § 1983 in federal court against multiple defendants, including the Department, Pocomoke City, and the State's Attorney for Worcester County, seeking damages and attorney's fees as well as declaratory and injunctive relief. *Savage v. Maryland*, 896 F.3d 260, 267 (4th Cir. 2018). The State's Attorney, whom the plaintiffs sued in only his personal capacity, was dismissed from the case based on prosecutorial immunity. *Id*. at 274-75.

their subordinates to resolve the incident without charging or citing Matthews because of their "membership in the Mason brotherhood." On July 16, 2016, a Worcester County grand jury indicted Sewell for corruptly committing misconduct in office and conspiring to commit the misconduct with Green.

To rebut the charge that he acted corruptly, Sewell maintained that his handling of the investigation was reasonable under the circumstances and consistent with the routine discretion that a small-town police chief exercises. He offered two expert witnesses who would have testified, among other things, to the considerations and objectives that impact a police chief's exercise of discretion during an investigation. The circuit court, however, granted the State's motion to exclude Sewell's experts' testimony, deciding that such testimony would not assist the fact-finder.

At trial, the alleged association between Sewell and Matthews through their membership in the Prince Hall Masonic Lodge did not emerge from the evidence. The State focused, instead, on eliciting testimony that described Sewell's conduct as "unusual" and out of the ordinary. The jury convicted Sewell of misconduct in office but acquitted him of conspiring with Green.

On appeal, Sewell raises five issues that drive at the fairness of the proceedings below:

"1. The jury's verdict finding Chief Sewell guilty of misconduct in office was not based on sufficient evidence."

"2. The trial court abused its discretion in excluding Chief Sewell's expert on law enforcement officer discretion."

"3. The trial court erred in admitting Officer Barnes's lay opinion testimony concerning whether it was right or wrong for Chief Sewell to instruct her to write up the traffic incident as an accident."

"4. The trial court abused its discretion in denying Chief Sewell's motion to dismiss for government misconduct without a hearing."

"5. The trial court abused its discretion in denying Chief Sewell's motion for new trial."

Sewell asks this Court to dismiss the case against him with prejudice or, alternatively, remand for a new trial. We will grant the alternative relief.

Although the State failed to show that Sewell's membership in the Prince Hall Masonic Lodge motivated his actions or had any relevance to the crimes charged, we (the majority) conclude that the balance of the circumstantial evidence presented at trial was enough to surmount the legal sufficiency hurdle. Still, the trial court erred by excluding Sewell's expert witnesses. The trial judge failed to appreciate that the proffered testimony was relevant and would have shed light on issues that are "beyond the ken" of the average layperson. This error prejudiced Sewell, especially given that the State's case rested on circumstantial proof of corrupt intent provided by subordinate officers who worked for the Department that Chief Sewell alleged had discriminated against him and fired him retaliatorily. We discern no abuse of discretion in the trial court's decision to deny Sewell's motion to dismiss for government misconduct without a hearing. In light of these holdings, we do not reach Sewell's final issue on appeal.

The right to a fair trial is enshrined in our laws. Under the circumstances presented in this case, the risk of unfairness is intolerably high. We remand for a new trial.

3

# BACKGROUND

## *The Traffic Incident*

Around 11:30 at night on November 21, 2014, a phone call woke Gayle Conrad as she slept in her home on Cedar Street in the "north sector" of Pocomoke City. It was a neighbor calling to let her know that a vehicle had struck her husband's truck, which was parked on the street in front of the Conrad house, and that the vehicle had left the scene. She went outside and saw that her grandson's vehicle, which was parked behind her husband's truck, was also damaged. Then, she observed "a wheel and part of an axle" that did not belong to either her husband's truck or her grandson's car lying in the road between the two vehicles. After Ms. Conrad called the Department, a dispatch officer reported the incident over the Department's radio and asked for a nearby officer to report to Ms. Conrad's residence for "a hit and run."

The driver was Douglas Matthews, a correctional officer, who later claimed that he fell asleep while driving home from a late meeting at the Prince Hall Masonic Lodge, just four to five blocks from his home. After hitting the two unoccupied cars parked in front of the Conrad home, he immediately drove about two blocks farther to his own home and called to report the accident to Green.

Meanwhile, around the same time, Pocomoke City Police Officer Damien McGlotten, who was on patrol in the south sector of the city, and Officer Tanya Barnes, who was on patrol in the north sector of the city, were responding to a noise complaint at an apartment complex in the south sector of Pocomoke City. After dispatch reported the

4

hit and run, McGlotten and Barnes got into their respective patrol vehicles and drove to the scene. McGlotten later explained that, although the hit and run occurred in the north sector, the dispatcher assigned the call to him because Barnes had been assigned to the noise complaint and "hadn't cleared her call yet . . . saying she was back in service."

Once McGlotten arrived at the Conrad residence, he observed the damage to the vehicles and proceeded to interview Ms. Conrad and her husband to find out what they knew about what happened. Barnes arrived next, and sometime thereafter, Green arrived on the scene and spoke with the officers and witnesses. McGlotten testified at trial that he found Green's presence to be "unusual" because "the call came out extremely late," Green hadn't notified anyone that evening that he was on shift, and he was not in uniform at the time.

A call came over the radio stating that the vehicle responsible for the hit and run had been located a few blocks away in front of the Matthews' residence. Corporal Brad Morgan radioed that he had found a suspect, Matthews, who was not drunk or impaired, just scared. According to McGlotten, when he informed Green that he was going to respond to that location, Green instructed him to stay at the crash scene. McGlotten agreed, and both he and Barnes remained at the crash scene while Green went to the Matthews' residence. After approximately 20 or 30 minutes, Green radioed to McGlotten to "come over" to the Matthews' residence.

When McGlotten and Barnes arrived at the Matthews' residence, they met Morgan, and shortly thereafter, Sewell arrived on the scene dressed in plain clothes. The officers met out front of the Matthews' residence, where McGlotten briefed Sewell on the accident

5

and subsequent investigation. McGlotten would later testify that "it was pretty unusual" to have both Green and Sewell "show up late" to the scene of a "basic accident" and for "both to be in plain clothes."

Following the briefing, Sewell assigned the call to Barnes, and told her that "it was just an accident" and that "it wasn't a hit a[nd] run." McGlotten then left the scene, and Barnes followed Sewell inside the Matthews' residence, where they found Matthews in the living room with his wife. Barnes attempted to ask Matthews if he was under the influence of any alcohol or medication but, she claimed, Sewell responded for Matthews and said that he "wasn't drinking." Barnes eventually completed a report characterizing the incident as an "accident," as Sewell had directed. The Department did not charge Matthews with a crime or issue him a citation.

### *Indictment*

About 20 months after the Matthews incident, on July 19, 2016, a Worcester County grand jury indicted Sewell on two counts: (1) conspiracy to commit misconduct in office and (2) misconduct in office. The indictment charged that Sewell, conspiring with Green, did "corruptly commit misconduct in office by knowingly, willfully, and intentionally, under the color of his office, interfering with the legitimate investigation of a motor vehicle accident by subordinate police officers for the personal benefit of an acquaintance, Correctional Officer Captain Douglas E. Matthews."

### *Motion to Dismiss for Retaliatory Prosecution*

Prior to trial, on October 12, 2016, Sewell filed a motion to dismiss the indictment for governmental misconduct. He alleged that the charges filed against him constituted

retaliatory prosecution based on a series of lawsuits he had filed against the Pocomoke City Police Department and Worcester County State's Attorney's Office. In March 2015, while still Chief of the Department, Sewell filed a federal complaint of discrimination with the EEOC against the Department, which he later amended on June 9, 2015, to also include a charge of racial discrimination against the Worcester County Sheriff's Office. The Pocomoke City Council and Mayor terminated Sewell on June 29, 2015, after which he amended his EEOC complaint again—this time to allege retaliatory termination based on his refusal to fire Savage and Green, both of whom had their own charges of discrimination pending against the Department.[3] The EEOC issued determinations on April 29, 2016, finding reasonable cause to believe that Sewell was "subjected to harassment in retaliation for protected activity[,]" and "discharged in retaliation for protected activity." *See* EEOC Determinations re: Charge Nos. 531-2015-01013; 531-2015-02134.

Sewell alleged in his memorandum in support of his motion to dismiss the indictment that the timing of the indictment and Worcester County State's Attorney's involvement in the investigation were "curious" and showed improper prosecutorial motives. According to Sewell, the investigation against him was a "vague morass of allegations of wrongdoing[,]" until late September 2015, when "the case, as it would come to be known in its current form, coalesced, in large part due to the involvement of [the

---

[3] Savage complained to the EEOC that he was subjected to unlawful discrimination and retaliation while he was employed by the Department and on detail to the Worcester County Criminal Enforcement Team ("CET"), a multi-jurisdictional drug interdiction task force led by the Worcester County Sheriff's Office. He also filed a complaint with the Maryland Attorney Grievance Commission against the State's Attorney for Worcester County on July 22, 2014.

State's Attorney]."  In response to a September 22 inquiry from an investigator for the State Prosecutor, the State's Attorney forwarded four reports that he felt suggested that "Sewell may have improperly intervened in different traffic citations[,]" including the Matthews incident.  Sewell alleged that "it [wa]s no coincidence that the pattern of th[e] prosecution [wa]s proceeding almost essentially as [the State's Attorney] outlined."  Sewell concluded that, following his "very heated and very public dispute" with the Department and State's Attorney's office, they acted in concert with investigators from the Office of the State Prosecutor to orchestrate and engineer the present case and its underlying investigation.

Sewell attached 13 exhibits to his motion to dismiss, including copies of the EEOC complaints and the EEOC's determinations, and memoranda from the State Prosecutor's office and its investigator that outline their interviews related to the investigation into Sewell.  These investigatory memoranda tended to show that the State Prosecutor did not limit its investigation to the Matthews' incident but also considered several other allegations related to Sewell and his time as Chief of the Department.  The two other exhibits were a transcript of Matthews' testimony before the grand jury in which he stated that he was sober at the time of his crash and a note that was allegedly left on the windshield of Sewell's car that contained explicit, racist language and warned Sewell that a Pocomoke City Councilman is "tel[l]ing people in pocomoke to go against you" and "is working hard to get rid of you."

The State responded by characterizing as baseless Sewell's accusation that the State's Attorney "orchestrated and engineered" the State Prosecutor's case against him. The State declared that the only role that the State's Attorney played in the investigation

8

was to respond to the State Prosecutor's request for information and that "neither [the State Prosecutor] nor anyone else outside of the Office of the State Prosecutor was involved in any way whatsoever with the State's decision to prosecute [] Sewell criminally." Notably, the State highlighted three occasions when Sewell conceded that he did not believe the State Prosecutor was motivated by racial or retaliatory bias. Sewell failed to proffer "any facts whatsoever that indicate the State Prosecutor had any communication whatsoever with any of these parties concerning the charges in the indictment." Consequently, the State asserted that "no evidentiary hearing [wa]s warranted" because Sewell "proffered no verifiable facts amounting to any evidence tending to show the existence of the State's bad faith."

On November 3, 2016, the circuit court denied Sewell's motion to dismiss without holding an evidentiary hearing.[4]

### *The State's Motion to Exclude Sewell's Expert Witness*

Sewell notified the State that he intended to call two expert witnesses to testify that his conduct on the night of the Matthews incident was a reasonable exercise of his

---

[4] At the subsequent motions hearing on November 22, 2016, the State argued, in support of its motion to exclude any mention during trial of the EEOC complaints or the federal civil suit, that allowing the defense to comment in any way on these actions "would just be an intent to taint the jury and bring up something that's totally irrelevant." Counsel for Sewell argued that "what we do have in this situation . . . is the issue of bias. . . . There are witnesses that the State doubtless will call who are . . . demonstrably biased against our client because of those facts . . . and [Sewell] doesn't have to have sued them. . . . They have to be sympathetic to, allied with Defendants on that action." The motions court decided it was premature to decide this issue and deferred to the trial judge. At oral argument before this Court, the State Prosecutor represented that the trial judge did not rule on this issue because none of the witnesses called to testify were ever directly involved in the EEOC claim or federal suit.

discretion under the circumstances. He proffered that the witnesses would testify, in part, "about the various considerations that police officers are trained to analyze in deciding whether the issuance of a citation is appropriate, and whether and when it is appropriate to detain a person and seek testing for alcohol or other impairing substances." The State moved *in limine* to exclude Sewell's proffered experts on police officer discretion. The State argued that the charge of official misconduct required the trier of fact "to decide whether or not Defendant Sewell wrongfully interfered in an accident investigation being conducted by subordinate officers, not whether or not he individually acted within his discretion in not taking further action against Matthews." According to the State, this "proffered expert testimony w[ould] not assist the trier of fact [] to understand the evidence or to determine a fact in issue, rather it w[ould] tend to confuse the jury by misdirecting their attention away from the real issue."

Sewell opposed the State's motion, arguing that his proffered experts would assist the finder of fact because the allegations against him "go directly to the Chief's exercise of discretion[,]" and his experts "w[ould] assist the trier of fact by explaining the ambit of discretion that is accorded to law enforcement officers and their supervisors and how that ambit of discretion applies to the facts of the present case." Along with Sewell's opposition brief, he included the *curriculum vitae* and an affidavit from Steven Ashley, one of his proffered experts.

In his affidavit, Ashley, a former law enforcement manager, risk management professional, and criminal justice trainer who had testified as an expert in over 30 criminal cases, related, "I [] understand that Officer Barnes contends that Chief Sewell interfered

10

with her questioning of Mr. Matthews. . . . I also understand that Officer Barnes has testified to the effect that Chief Sewell may have committed some impropriety by suggesting it was her responsibility to write the accident report. The officers on the scene did not conduct field sobriety tests on Matthews, nor did they subject him to a breathalyzer test." Ashley then observed that, as evidenced by The Pocomoke City Police Department Written Directives, officers have broad discretion and must weigh various considerations. He explained that this "broad discretion applies to all aspects of an investigation, including what inquiries to make or not make, how an incident is reported, and determining what are the pertinent facts to consider." Ashley opined that "it would have been within Chief Sewell's discretion to answer inquiries from Officer Barnes[,]" and that "supervisors or officers in a supervisory position are within their discretion to delegate various responsibilities, including the writing of an accident report. If Chief Sewell assigned the writing of the report to Officer Barnes, it is my opinion that decision was within his discretion."

A circuit court judge considered these arguments along with several other motions at a hearing held on November 22, 2016. The court delivered a brief oral ruling in which it granted the State's motion to exclude Sewell's experts, and stated that the proffered expert testimony "would not assist the jury as trier of fact in resolving the issues, and, in fact, I believe it might [] lead to confusion."

## *Trial*

The case proceeded to trial on December 1, 2016. The State called as the first witness Gayle Conrad, who testified to the events of the evening following the accident.

11

She related that several officers came and left her home, but that "nobody seemed to know what to do." The State's next witness was Anthony Tull, a member of the Prince Hall Masonic Lodge[5] located in or near Pocomoke City. Tull stated that he knew Matthews,

---

[5] Sixty years ago, the Court of Appeals of Kentucky provided the following background on the Freemasons:

[T]he order of Free and Accepted Masons is an ancient and honorable secret fraternity. Its origin is lost in antiquity. The Masonic legend is that it began with the craftsmen at the building of King Solomon's Temple. Documentary rolls and other records, still preserved, of the Fourteenth Century and later centuries prove the establishment and continuity of Masonic lodges at least from such times down to the establishment of the premier Grand Lodge of England in 1717. From that time previously separate lodges became subordinate affiliates of Grand Lodges. All regular grand and subordinate lodges throughout America, directly or indirectly, have sprung from this mother grand lodge.

\* \* \*

Prince Hall, a free Negro, a native of Barbados, West Indies, became a worthy resident of Massachusetts. He knocked and the door of Masonry was opened to him by a British Military Lodge in Boston in the year 1775. He was the first man of African descent to become a Master Mason in America. Hall became a Revolutionary War patriot, receiving recognition from General Washington and other leaders. After the war, Hall and his brethren were refused a charter by the Provincial Grand Lodge of Massachusetts because of their race. Upon their application, the Grand Lodge of England, "under authority of His Royal Highness, Frederick, Duke of Cumberland, Grand Master of the Most Ancient and Honorable Society of Free and Accepted Ancient Masons," granted them a charter on September 29, 1784, under the name of African Lodge No. 459, to be opened in Boston. That was done in May, 1787. Later, African Lodge No. 459 declared itself to be a Grand Lodge with jurisdiction throughout the United States, and the Grand Lodge of England granted a patent or provincial powers to the African Lodge as such. After the death of Prince Hall in 1807, the colored Masonic grand lodges changed their names in his honor and many succeeding lodges have adopted it.

As time went along, Prince Hall Grand and subordinate lodges of colored Masons were chartered and organized throughout the United States, Canada and other countries, all of them springing from African Lodge No. 459.

12

Sewell, and Green as fellow Masons and that Sewell had been a member of the Prince Hall Masonic Lodge "approximately since 2014." Tull also stated that Sewell had been to "some" Mason-related events but "not very many." He related that both Sewell and Green were relatively new members of the lodge. After he explained the activities of the lodge in the community, the State asked again how often he saw Sewell at Mason-related events, to which he responded: "Not very many. Truthfully not very many, but he has been to some."

McGlotten was the State's first witness from the Department. He began his testimony by describing how the Department divided the City into the north and south sectors and explained that "when an officer is not back in service in their sector, the other sector officer handles the call or the dispatcher knows automatically to pass it to them, so that way it expedites the response." He and Barnes were responding to an incident at Sunshine Village in the south sector of the city when he heard the call come in over the radio to "respond to 712 Cedar Street for a hit and run" in the north sector. He believed that Dispatch assigned the call, located in Barnes' sector, to him because "Barnes hadn't cleared her call yet basically saying she was back in service," even though they had completed their call to Sunshine Village. Both officers got into their respective vehicles and drove over to Cedar Street.

Once McGlotten arrived at the scene of the accident, he observed "a wheel laying in the street" and "the damage that was done to vehicles that were on the scene." He exited

_____

*Int'l Free & Accepted Modern Masons v. Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Ky.*, 318 S.W.2d 46, 48–49 (Ky. 1958) (footnote omitted).

his patrol vehicle and contacted the car's owner to "figure out exactly what they saw, what happened." At some point during the investigation, Green arrived on the scene. McGlotten explained that Green was his boss. The State Prosecutor asked him whether "it was unusual that you saw Lieutenant Green at the scene at 712 Cedar Street?" McGlotten told the members of the jury why it was unusual:

> A. The call came out extremely late. It was near midnight. . . . The lieutenants typically when they're working, if they're assigned . . . back then they would do day and evening shift, you would know that they were on duty. . . . And at that point he hadn't throughout the whole evening notified that he was on shift or working.
>
>                            *   *   *
>
> Q. Do you remember what he was wearing that evening?
>
> A. He was dressed in plain clothes.
>
> Q. Is that unusual?
>
> A. Yes.
>
> Q. Why?
>
> A. The uniform that he would have been wearing if he works evening shift, we call it BDU uniforms.

According to McGlotten, a radio call from Morgan came over the radio stating that the vehicle responsible for the hit and run had been located a few blocks away in front of the Matthews' residence. Green instructed him to stay at the scene with Barnes while he went to the Matthews' residence. The State again asked McGlotten "[d]id you think it was unusual that Lieutenant Green asked you to stay?" He said that he did, and when asked to explain to the jury why it was unusual, he elaborated: "Being that there was nothing else

left for me to do, I had already run the registration of the vehicles and everything was done[.]"

McGlotten and Barnes eventually went over to the Matthews' residence. When they arrived, McGlotten saw that both Morgan and Green were there, and eventually "Chief Sewell arrived and was driving . . . a departmental issued" car. The State again directed McGlotten's testimony to what was unusual about Sewell's arrival:

> Q.   So, Officer McGlotten, first your boss, Lieutenant Green, is at the scene. Now your boss['s] boss, Chief Sewell, is at the scene. Is that unusual?
>
> A.   Yes.
>
> Q.   Tell the ladies and gentlemen of the jury why.
>
> A.   This is -- this incident is a basic accident. We go through these processes. I mean, there's at least one a week in the City of Pocomoke where there's accidents that do occur. . . . And for that time of night, [] both Lieutenant Green and Chief Sewell to show up that late out there and both be in plain clothes, it was pretty unusual[.]
>
> \*   \*   \*
>
> Q.   What's Chief Sewell wearing that evening?
>
> A.   He was wearing a dark colored hoodie, I believe it was black, and shorts, dark colored shorts.
>
> Q.   He wasn't wearing a uniform?
>
> A.   No.

When Sewell arrived, McGlotten met with the officers on the scene and gave Sewell a "recap" of what was going on. Then Sewell looked at him and asked, "whose call is

this[?]" McGlotten stated that it was his call—"[i]t was assigned to me." The prosecutor asked next:

> Q. What does Chief Sewell do?
>
> A. He paused probably for about five seconds and he said -- he basically he was, like okay. And then that's -- Officer Barnes ends up speaking up and says that she can take the call.
>
> Q. Let's talk a minute before we talk about Officer Barnes. Let's talk about that five second pause. Was that unusual?
>
> A. Yes.

The trial court then sustained the defense's objection to the last question and answer, as it was without foundation. McGlotten continued his testimony by explaining that he wasn't okay with Sewell assigning the case to Barnes because he "didn't know the reason behind it[,]" and "had already basically put in the work and done everything other than talk to the suspect."

On cross-examination, however, McGlotten agreed that when Sewell asked who was assigned the investigation, he "explained that it should have been assigned to Officer Barnes, but she was busy when the call was dispatched, so I w[as] the first responder and the one who began the investigation," but "Officer Barnes volunteered to take it, so Sewell said that Barnes could take it." On re-direct, the State Prosecutor asked McGlotten to explain to the jury how assignments work within the Department. He responded: "Typically it's I want to say customary that if it's assigned to you, you just go and handle it. Otherwise, it looks almost as though you're also complaining and everything like that.

16

And when you also . . . already handled the majority of the incident, the incident is essentially yours."

Following brief testimony from Ms. Conrad's husband about his observations from that night, the State Prosecutor called Barnes as a witness. Again, the State Prosecutor's questions focused largely on what she found "unusual" about the night in question. Barnes confirmed after each question that she considered things to be unusual—the wheel in the road at Ms. Conrad's house, the missing wheel at the Matthews' house, and the police chief responding to a call that did not involve a major crime.

Fixed on the "unusual" motif, the State next inquired whether there was "anything unusual to [Barnes] about the way" Sewell asked her and McGlotten who was handling the call. Barnes responded that it was unusual because Sewell was "looking directly at [her] . . . [j]ust kind of implying that he wanted me to take the call." After the third time Sewell asked, she told him she would take the call. Barnes then testified that when she asked Matthews if he had been drinking or was impaired by medication, and why he left the scene of the accident, Sewell answered for Matthews the two times she asked Matthews these direct questions. She said that Sewell directed her "to write it as an accident report," and advised her "that it wasn't a hit and run, and that the driver of the vehicle was not intoxicated or impaired." So, she wrote an accident report, which Green signed as her supervising officer. The State asked her about what she did later that evening:

| [STATE]: | Okay. [] Officer Barnes, based on what happened that evening, what did you do when you were – after you were off-duty? |
|---|---|
| [DEFENSE]: | Objection. That's going to ask for an opinion, too. |

17

| THE COURT: | No. It asks what she did. That's permitted. |
|---|---|
| [BARNES]: | I called my pastor. |
| [DEFENSE]: | Objection. |
| THE COURT: | No. He asked what she did. She called her pastor. |
| [STATE]: | Why did you call your pastor? |
| [DEFENSE]: | Objection. |
| THE COURT: | Sustained. |
| [STATE]: | What did you tell your pastor? |
| [DEFENSE]: | Objection. |
| THE COURT: | Overruled. |
| [STATE]: | And I'm not asking you to go into any personal details. |
| [BARNES]: | I advised him that I had a call that I wasn't sure about and I needed him for [sic] pray for me. And I explained to him some of the details. |

During Barnes's cross-examination, the defense played the call that was radioed in by Morgan when he found Matthews' car:

| [DEFENSE]: | Were you able to hear that? |
|---|---|
| [BARNES]: | Yes. |

* * *

| [DEFENSE]: | Did you hear a reference in there about it's not alcohol or drug related? |
|---|---|
| [BARNES]: | Yes. |
| [DEFENSE]: | The suspect just got scared? |

18

[BARNES]:          Yes.

[DEFENSE]:       Whose voice was that?

[BARNES]:          Corporal Morgan.

After Barnes testified, the State called Matthews as its final witness. Matthews testified that he fell asleep in the four to five blocks between the lodge and the scene of the accident. Once he struck the car, he "got up and gathered" himself and "somehow maneuvered" his vehicle to his house, where his vehicle "ceased to move." Matthews could not explain why he did not stop at the scene of the accident or how he managed to drive his vehicle, which was missing a wheel, to his house. Matthews testified that, upon reaching his house, he "panicked" and telephoned Green. He could not explain why he panicked, nor could he explain how he "fell asleep in a four or five block ride," and had "no memory" of what happened. He said he had Green's card, so he called him to report the accident. He stated that he had one drink much earlier in the night but was not intoxicated. The State never asked Matthews if he had any relationship with or had ever met Sewell.

Following Matthews' testimony, Sewell moved for a judgment of acquittal. He argued that the State's evidence was "completely consistent with the proposition that Chief Sewell, right or wrong, [] truly believed that this was an accident." He insisted the State had produced no evidence that he harbored corrupt intent and no evidence to support its theory that "he was trying to put his thumb on the scales for a fellow [M]ason." The trial judge ruled that "there's sufficient evidence . . . to support the allegations of the State, so I'm going to deny your motion."

19

Sewell took the stand at the start of the defense case. He explained that, on the night of the Matthews incident, he was "working the 4:00 to 12:00 shift," parked in the parking lot of a local Walmart. He parked there because he had received reports that the store's security had been involved in "foot chases with people stealing" and that one of the store's employees might be "selling narcotics in the parking lot." He was dressed in plain clothes at the time because he oftentimes grew "tired of being in uniform all day long."

While in the Walmart parking lot, Sewell heard the radio call reporting the accident, so he decided to drive to the scene of the accident. He did so because "it sounded like a lot of commotion and everything," and he wanted to "figure out what's going on" and "to be of assistance" in "straightening things out." When he reached the scene of the accident, however, he heard a radio report from Morgan indicating that the suspect's vehicle had been located at the Matthews' residence. During that same radio report, which was played for the jury, Morgan stated that Matthews was "not drunk or impaired" and that he was "just scared." On cross-examination, Sewell admitted that Green had also called to inform him that Matthews was involved in the accident. In response to a question by the State, Sewell said that this was "not unusual" because he and Green "talk on the phone a lot" and Sewell "always show[s] up on scenes."

After staying at the scene of the accident for "a brief moment," Sewell drove to the Matthews' residence, where he encountered Morgan and Green. He went into the house and asked Matthews if he was "okay." In so doing, Sewell "got close" to Matthews. He said he asked Matthews no further questions but could tell that "[h]e did not have alcohol on his breath" or slurred speech, so he concluded Matthews was not intoxicated. His

20

training taught him to distinguish mistakes of the head, like drinking and purposefully hitting a car, and mistakes of the heart: "I came to the conclusion that it was a mistake of the heart. He fell asleep. He tried to make it home. And he wasn't intoxicated."

Sewell then went outside, where he met Barnes and McGlotten, and asked the officers, "who's writing this?" According to Sewell, Barnes "immediately said, 'I'm writing this.'" From Sewell's perspective, it was Barnes' assignment because it was her post and, when he asked, Barnes responded immediately that she was writing the report, so he instructed her to write it as an accident. He explained that, when he became Chief, he divided the city into sectors based on crime data in the Department's Compstat program[6] and that officers are assigned to a specific sector in which they have "post integrity," meaning, "don't want another officer handling calls on your post. You want to take care of your own post." He explained that Compstat is "an effective way to track officers, what they do out there on a daily basis," and "[b]asically track[s] everything they do from their day-to-day operations." Accordingly, Sewell testified, Barnes took the call "and that was it."

---

[6] Compstat is a Geographic Information System that the New York Police Department developed in 1994. Andrew Guthrie Ferguson, *Crime Mapping and the Fourth Amendment: Redrawing "High-Crime Areas"*, 63 Hastings L.J. 179, 192 (2011). The program "created an integrated data-management system for police statistics that required weekly data updates, crime mapping, targeted police responses, and an accountability mechanism that was primarily data driven." *Id.* Judge Shira Scheindlin, in an opinion for the United States District Court for the Southern District of New York, summarized Compstat as follows: "The system collects and analyzes statistical and other data about local crime and enforcement activities, conducts weekly meetings during which senior officials question local commanders about the data, and holds commanders accountable for addressing crime conditions and improving the quantitative measures of their performance." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 592 (S.D.N.Y. 2013).

After speaking with Barnes, Sewell got back in his vehicle and returned to the Walmart parking lot. Sewell asserted that he did not try to intimidate Barnes, and that Matthews' status as a Mason did not affect his determination that the incident was simply an accident. He also explained that "officers assigned to the north [sector] know they answer calls on the north or investigate cases on the north." Later, the State asked Sewell why he refused to allow Barnes to interview Matthews in his home following the incident. He replied that he was "never inside the house with Officer Barnes at all" and that "she was lying."

At the close of all evidence, Sewell again moved for a judgment of acquittal, and the circuit court reserved its ruling. The circuit court instructed the jury on the law, including the elements of the charge of misconduct in office:

> Misconduct in office is corrupt behavior by a public official in the exercise of his duties of office or while acting under color of office.
>
> In order to convict the defendant of this offense, the State must prove, one, that the defendant was a public officer, two, that the defendant acted in his official capacity, and three, that the defendant corruptly did an unlawful act.
>
> The word corruption is used in the sense of depravity, perversion or taint. The conduct must be a willful abuse of authority. A mere error in judgment or mistake is not enough to constitute corruption.
>
> Law enforcement officials have discretion to issue citations and make arrests. Discretion in this context means that police officers are not required to make arrest or issue citations even if they have probable cause to believe that a person committed or is committing a violation. You may consider the fact that police officers are not required to make arrests or issue citations even if they have probable cause in determining whether or not [Sewell's] conduct constitutes corrupt action beyond a mere error in judgment.

22

The jury ultimately convicted Sewell of misconduct in office. Sewell thereafter filed a renewed motion for judgment of acquittal, as well as a motion for a new trial, arguing, as he does here, that the evidence was insufficient to sustain the conviction and that the State Prosecutor made misrepresentations to the circuit court about his office's contacts with the State's Attorney, which raised doubts about the fairness of the verdict. Following a hearing, the court denied Sewell's motions for judgment of acquittal and for a new trial.

Sewell noted his timely appeal to this Court on January 3, 2017.

## DISCUSSION

## I.

## Motion to Dismiss

Sewell complains that the circuit court erred in denying his pretrial motion to dismiss without holding an evidentiary hearing. He maintains that a court must grant a defendant an evidentiary hearing when the defendant moves to dismiss on the grounds of vindictive and/or retaliatory prosecution if the defendant presents some evidence tending to show the State acted in bad faith. According to Sewell, he offered the court three verifiable circumstances that tended to show the prosecution was retaliatory: (1) he had filed the EEOC claims against the State's Attorney, Sheriff's Office, and the Department; (2) the State's Attorney substantially drove the State Prosecutor's allegations against him; and (3) the State Prosecutor "ignored" allegations that Sewell made regarding improper conduct by the State's Attorney. Sewell avers that "the information presented showing an ulterior, improper motive for this prosecution warranted a grant of an evidentiary hearing."

23

The State responds that the circuit court was correct to deny Sewell's motion without a hearing because the State Prosecutor's office conducted its own independent investigation into Sewell's official misconduct, regardless of the State's Attorney's responses to requests for information. Moreover, the State points out that Sewell expressly stated on three occasions that he *was not* accusing the State Prosecutor of bad faith. Instead, he offered a theory that the State's Attorney manipulated the State Prosecutor's office without, according to the State, "any facts whatsoever to support his conspiratorial theory that the State ha[d] been 'manipulated' by the Worcester County State's Attorney or anyone else."

In *McNeil v. State*, this Court adopted a standard governing a defendant's right to an evidentiary hearing on a claim of prosecutorial misconduct. 112 Md. App. 434, 465 (1996). After assessing the standards employed by several federal courts of appeal, this Court "conclude[d] that a defendant is entitled to a hearing, if timely requested, to prove or dispel his claim of misconduct if he proffers *verifiable facts* amounting to 'some evidence tending to show the existence of' the State's bad faith." *Id.* at 465 (adopting language from *U.S. v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). Sharing the concern articulated by the Seventh Circuit of "'the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives,'" we cautioned that "[a] mere general allegation of prosecutorial misconduct is not sufficient to warrant the granting of an evidentiary hearing." *Id.* (quoting *U.S. v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973)). Therefore, such an intrusion on the prosecutor is warranted "*in limited*

24

*circumstances*, . . . if the defendant 'presents facts sufficient to raise a reasonable doubt' about *the prosecutor's* motive." *Id.* (quoting *Falk*, 479 F.2d at 620-21) (emphasis added).

In *Robinson v. State*, this Court decided several issues, including whether a defendant was entitled to an evidentiary hearing on his claim of vindictive prosecution. 209 Md. App. 174, 184 (2012), *overruled on other grounds by Dzikowski v. State*, 436 Md. 430, 456 (2013). In response to a fight outside of a bar, Robinson drove his car into one of the bar's security guards, who happened to be an off-duty deputy with the Prince George's County Sheriff's Office. *Id.* at 180-81. The State charged Robinson criminally but then nol prosed the charges. *Id.* at 181. A month later, the State charged Robinson again, leading Robinson to allege vindictive prosecution and request an evidentiary hearing. *Id.* at 181, 184. Robinson asserted that his prosecution was retaliatory because the State recharged him only after he had "filed a notice of intent to file suit against the police[.]" *Id.* at 184. The circuit court denied his motion without an evidentiary hearing and this Court affirmed, concluding that Robinson did not meet the standard set out in *McNeil*. *Id.* at 190. We reasoned that Robinson "provided the circuit court with no evidence of actual vindictiveness, nor did he provide verifiable facts supporting his claim of vindictive prosecution." *Id.* It was not enough that the State refiled its charges after Robinson filed his civil suit. We ruled that "[a] claim of vindictive prosecution based solely on the timing of the filing of the charges, without some evidence of actual bad faith, does not rise beyond the level of mere conjecture." *Id.*

Returning to the case before us, we discern no error in the court's decision to deny Sewell's motion without an evidentiary hearing. The record demonstrates that Sewell

25

conceded, on three occasions prior to the court's decision, that he was not accusing the party against whom he directed his motion, the State Prosecutor, of governmental misconduct:

1. In his memorandum supporting his motion to dismiss, Sewell stated specifically, "[o]ur arguments are not directed at the specific attorneys litigating this case: Emmett Davitt or Kelly Madigan. Instead our discussion focuses on the investigators in this case, and another prosecutor," the State's Attorney.

2. In a memorandum supporting his motion to compel discovery, Sewell reiterated, "The State correctly notes that, at a meeting which we sought with Mr. Davitt and Ms. [Madigan], we referred to our series of prior interactions with Mr. Davitt and told him that we did not believe that he personally was motivated by racial animus or retaliatory motive."

3. In his motion for an evidentiary hearing, Sewell indicated that he did not believe that the State Prosecutor "has been animated by personal racial bias." Instead, Sewell argued that the State Prosecutor "has been manipulated into bringing this prosecution by the State's Attorney for Worcester County, the investigators working for the Special Prosecutor's Office, the Worcester County Sheriff, and the Maryland State Police."

Apart from these concessions, we also observe that the facts alleged in Sewell's motion and the exhibits attached thereto focused on the conduct of local agencies unconnected to the State Prosecutor.[7] None of this constituted verifiable evidence that the State Prosecutor was engaged in a conspiracy with the local officials, or that the State prosecution was "orchestrated and engineered" by the Worcester County State's Attorney.

---

[7] The only exhibits that Sewell attached to his motion to dismiss that related to the State Prosecutor were memoranda from the State's investigation of Sewell, showing that the State Prosecutor investigated him for more incidents of misconduct than he was ultimately charged with. Rather than prove, as Sewell claims, that the State Prosecutor was on a fishing expedition as part of a larger governmental conspiracy, the memoranda more readily evince prosecutorial restraint. Without more, Sewell failed to create a reasonable doubt as to the State Prosecutor's motive. *See McNeil*, 112 Md. App. at 465.

As the State pointed out in its opposition to his motion to dismiss, "Sewell d[id] not proffer any facts whatsoever that indicate the State Prosecutor has had any communications whatsoever with [the State's Attorney, the Sheriff, or the State Police]."  Even now on appeal, Sewell cannot say how the State's Attorney manipulated the State's Prosecutor.

Without verifiable facts or allegations of misconduct by the State Prosecutor, Sewell relies on the timing of his indictment, which he believes was "curious."  But, as we ruled in *Robinson*, "[a] claim of vindictive prosecution based solely on the timing of the filing of the charges, without some evidence of actual bad faith, does not rise beyond the level of mere conjecture."  209 Md. App. at 190.  We hold that Sewell failed to "present facts sufficient to raise a reasonable doubt about the [State Prosecutor's] motive," *McNeil*, 112 Md. App. at 465 (internal quotations omitted), and therefore, the circuit court did not err in denying his motion without an evidentiary hearing.

## II.

### Evidence of Official Misconduct

At Sewell's trial, the State carried its burden to adduce sufficient evidence to convict Sewell of official misconduct and, therefore, the court was correct in denying the motion for acquittal for the reasons stated below.  We hold, however, that the trial court committed reversible error by precluding Sewell from introducing expert witness testimony in his defense.

### A.  Official Misconduct

First, we review the elements necessary to prove official misconduct, which is a common-law misdemeanor in Maryland.  *Leopold v. State*, 216 Md. App. 586, 604 (2014)

27

(citing *Duncan v. State*, 282 Md. 385, 387 (1978)).  Misconduct in office is defined as "corrupt behavior by a public officer in the exercise of the duties of his [or her] office or while acting under color of" his or her office.  *Id.* (quoting *Duncan*, 282 Md. at 387); *see also* Rollin M. Perkins & Roland N. Boyce, *Criminal Law* 543 (3d ed. 1982).  Although it is a singular offense, the crime of official misconduct covers three modes of behavior: (1) misfeasance, (2) malfeasance, and (3) nonfeasance.  *State v. Carter*, 200 Md. 255, 262-63 (1952).  "'Nonfeasance is the omission of an act which a person ought to do; misfeasance is the improper doing of an act which a person might lawfully do; and malfeasance is the doing of an act which a person ought not to do at all.'"  *Id.* at 262 (quoting *Bell v. Josselyn*, 69 Mass. (1 Gray) 309, 311 (1855)).  By way of example, a public officer tasked with awarding government contracts can commit *malfeasance* by rewarding a political donor with a public contract that the officer had no authority to grant and may commit *misfeasance* by rewarding the donor with a contract that is within the officer's authority to grant.  Perkins & Boyce, *supra*, at 545.  Accordingly, a public officer commits malfeasance by corruptly exceeding the scope of his or her authority and commits misfeasance by acting within the scope of his or her authority but doing so corruptly.  *Compare Piper v. Pearson*, 68 Mass. 120, 123 (1854) (holding that a magistrate was liable for finding the plaintiff in contempt in an action over which the magistrate had no authority to preside) *with People v. Norton*, 7 Barb. 477, 478, 480-81 (N.Y. App. Div. 1849) (explaining that, although the law may grant an officer "discretionary jurisdiction" to grant liquor licenses, that discretion cannot be "willfully abused[,]" and the officer may not grant or refuse to grant a license based on "corrupt and improper motives").

28

As in any other criminal prosecution, in a case of official misconduct, the burden of proof lies with the State to prove the official guilty beyond a reasonable doubt. *Harryman v. State*, 359 Md. 492, 505 (2000). Over 150 years of decisional law confirms that, regardless what type of act (or omission) forms the basis of a charge of official misconduct, the State must prove that the public officer acted "willfully, fraudulently, or corruptly." *Friend v. Hammill*, 34 Md. 298, 304 (1871); *see also Hiss v. State*, 24 Md. 556, 561 (1866) (relying on Lord Mansfield for the proposition that a justice of the peace may be liable for a discretionary act only if he exercises his discretion "maliciously or corruptly"). This is because official misconduct covers only "*corrupt behavior* by a public officer" in the exercise of his or her duties. *Duncan*, 282 Md. at 387 (emphasis added).

Requiring that the State prove corrupt intent in misfeasance cases shields public officers from liability for "the consequences of mistakes honestly made." *Bevard v. Hoffman*, 18 Md. 479, 483 (1862); *see also People v. Feerick*, 714 N.E.2d 851, 857 (N.Y. 1999) (explaining that the *mens rea* requirement protects officers from criminal liability for honest mistakes). As the Court of Appeals explained in 1862, "the nature of our institutions equally demands, that public officers, acting faithfully and honestly in the discharge of their duties, and within the limits of their constitutional powers, shall be protected from liability for mistake or errors of judgment from which none are exempt; *provided that they are unmixed with fraud or corruption*." *Bevard*, 18 Md. at 483 (emphasis added). The Court underscored this point later that century in *Mincher v. State*, ruling that when a public official is reposed with judgment and discretion in the discharge of his or her functions, that official may not be held liable, civilly or criminally, for

29

misconduct in office "except for acts done willfully, fraudulently, or corruptly." 66 Md. 227, 235-36 (1886) (citing *Friend*, 34 Md. at 304; *Bevard*, 18 Md. at 484). A jury acquitted Mincher, a voter registration officer, of all charges except one. *Id.* at 231. The jury found him guilty of violating a voter registration statute for "knowingly making and publishing [] a false and misleading" voter registration list. *Id.* at 231-32. Mincher claimed that the indictment was defective because it did not aver that he acted either willfully, fraudulently, or corruptly. *Id.* at 235-36. The Court of Appeals agreed that such proof is required "wherever the registration act devolves upon such officer the duty of exercising judgment in the discharge of their functions." *Id.* at 236. The Court concluded, however, that "[t]he duty of making out, completing, and publishing the two lists provided for in this section [of the statute] does not involve the exercise of any judgment whatever, nor is it left to the discretion of such officers to make out and publish the lists . . . it was only necessary for the count to charge, as it does, that the acts set out in it were unlawfully and knowingly done by the traverser." *Id.*

In the case of malfeasance, then, the conduct in question falls outside of the official's discretion and authority, and, if done willfully, is corrupt on its face. *See id.* at 235-36. The fact-finder can therefore infer the element of corruption without direct evidence of the official's intent to act corruptly because "wil[l]fulness and bad intent" are "necessary or probable accompaniments" of malfeasance. *See Carter*, 200 Md. at 263. For instance, a jury could infer corrupt intent from the act of a public officer who, in his capacity as police lieutenant, accepted gifts from several persons he allowed to maintain and conduct a house of prostitution in his jurisdiction. *See Hitzelberger v. State*, 174 Md. 152, 164-65 (1938).

30

In the case of misfeasance, however, because the conduct normally falls within the official's discretion and authority, the State must present evidence that the official *intended* to act corruptly—with a "sense of depravity, perversion, or taint." Perkins & Boyce, *supra*, at 542.

The distinctions between nonfeasance, malfeasance and misfeasance are not always clear in the cases that develop. *See id.* at 545 (observing that the distinction between malfeasance and misfeasance "is much less sharp in the actual cases than it is in legal theory, and . . . the courts have had little occasion to indulge in hairsplitting discussions of the problem"). For instance, consider the registration official in *Mincher*, 66 Md. at 235-36. One may argue that he committed misfeasance because his act (publishing a voter registration list) was within the scope of his authority. But because the official's duty to publish the names of registered voters was deemed ministerial—rather discretionary—his decision to willfully omit from the list the names of some registered voters was beyond the scope of his authority and was, therefore, malfeasance. *See id.*

Chief Judge Marbury declared in *Carter*, that what matters is "the gravamen of the charge, and it is not particularly important what it is called." 200 Md. at 267. In that case, the indictment charged certain officials with corruptly permitting individuals to post improper, inadequate and insufficient bail, and the appellants claimed that the indictment should be dismissed because it "contained in one count three separate and distinct crimes, malfeasance, misfeasance, and nonfeasance in office, and therefore was duplicitous." *Id.* at 259. Judge Marbury instructed that the officials were charged with performing their duties corruptly and improperly and that "[w]hether this is called malfeasance or

31

misfeasance or nonfeasance, it is a clear charge of misconduct in office, and it is the only charge contained in the indictment." *Id*. at 267; *see also Chester v. State* 32 Md. App. 593, 605 (1976) ("[A]ny corrupt violation by an officer in any of these three ways is a common-law misdemeanor known by some such name as 'misconduct in office' or 'official misconduct.'").

As these cases and the case before us illustrate, the measure of what constitutes official misconduct is an imbricating continuum of proof that runs from evidence of conduct squarely within an officer's discretion undertaken with corrupt intent (misfeasance)—to evidence of conduct clearly exceeding an official's scope of authority such that corrupt intent can be assumed (malfeasance). Conduct that toes the sometimes murky line between what is and what isn't within an officer's scope of authority,[8] falls

---

[8] In *Mincher*, the officer's ministerial duties were set out in statute, but the scope of a public officer's authority is often less definitive where he or she is imbued with broad discretionary authority. For example, in *Leopold*, this Court considered whether a county executive—an elected official with obviously very broad discretion—committed misconduct in office. 216 Md. App. at 590-91. We determined that the conduct at issue was an abuse of his discretion and amounted to official misconduct when he "direct[ed] [] subordinates to engage in illegal activity" and "oppressively and wil[l]fully abuse[d]" his authority by requiring subordinates to change his catheter bag. *Id.* at 608. Unlike the instant case, Leopold's primary objection was that the charge "misconduct in office" was unconstitutionally vague and overbroad. *Id.* at 604. Leopold also argued that the State switched the focus of its prosecution from one based on misfeasance to one based on malfeasance, and therefore, he did not have fair notice of the charges against him. *Id.* at 607 n.9. Judge Wright, writing for this Court, pointed out that the crime of misconduct in office encompasses both misfeasance and malfeasance. He explained that the conduct at issue was the kind that "'anyone with at least a semblance of common sense would know is contemptuous conduct[.]'" *Id*. at 608 (quoting *Smith v. Goguen*, 415 U.S. 566, 581 (1974)). Indeed, the trial court had observed that Leopold's actions were so "outrageous, egregious and wildly beyond any authority he possessed or could reasonably have thought he had obtained by virtue of his office" that a person of ordinary intelligence would understand that the conduct was unlawful. *Id.* at 608.

32

within the overlay on this continuum. One thing is certain: regardless of where on the spectrum between malfeasance and misfeasance that Sewell's alleged conduct falls, the ambit of his discretion remains central in the State's case for official misconduct.

## B. Sufficiency of the Evidence

Sewell's initial challenge on appeal is to the sufficiency of the evidence. Unless the State presented sufficient evidence at trial to convict him of official misconduct, "there c[an] be no new trial." *Bloodsworth v. State*, 307 Md. 164, 167 (1986); *accord Sloan v. State*, 70 Md. App. 630, 632 (1987).

Sewell contends that "the cornerstone of the State's theory"—that he and Matthews were acquaintances through the Masons—went unproven, leaving "no testimony of any relationship from which the jury could meaningfully infer that Chief Sewell even had a motive to corruptly interfere with the investigation." The remaining evidence, he avers, was insufficient to establish misconduct in office. For example, he submits that the State failed to prove that McGlotten would have reported the accident any differently had he written the report. Sewell contends that, even viewing the evidence in the light most favorable to the State, the evidence at trial was specious and insufficient.

In the State's view, the evidence on point "was overwhelming." The State asserts that, based on the testimony of Barnes and McGlotten and the circumstances of Matthews' crash, including the telephone calls between Sewell and Green right before they went to the scene, "a rational trier of fact . . . could have found that Sewell acted with corrupt intent when he interfered with the investigation of Matthews' hit-and-run, directed Officer Barnes to declare the incident an 'accident,' and issued no citations."

33

When reviewing the sufficiency of evidence, we view the evidence and any reasonable inferences therefrom in the light most favorable to the State and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Donati v. State*, 215 Md. App. 686, 718 (2014) (citations and internal quotations omitted). We do not reweigh the evidence but simply ask whether there was sufficient evidence—either direct *or circumstantial*—that could have possibly persuaded a rational jury to conclude that the defendant was guilty of the crime(s) charged. *Neal v. State*, 191 Md. App. 297, 314 (2010) (emphasis added); *Painter v. State,* 157 Md. App. 1, 11 (2004). In doing so, "[w]e defer to the fact finder's 'opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence[.]'" *Neal*, 191 Md. App. at 314 (citations omitted).

At trial in the underlying case, the parties agreed that Sewell was acting under the color of office. The only element of official misconduct at issue was whether he acted with corrupt intent. To prove corrupt intent, the State need not offer affirmative proof of the official's motives but may instead carry its burden of proof through reasonable inferences. *Jones v. State*, 440 Md. 450, 455 (2014) ("The State may prove a defendant's intent through 'direct [evidence] or circumstantial evidence[.]'" (citations omitted) (alterations in *Jones*)). As Perkins and Boyce note in their treatise, *Criminal Law*, "[i]n the search for corruption . . . there are many situations in which 'actions speak louder than words.'" Perkins & Boyce, *supra*, at 542. The question of corrupt intent in a case for misconduct in office is a question for the trier of fact. *See People v. Hardrick*, 671 N.W.2d 548, 552 (Mich. Ct. App. 2003).

34

The State Prosecutor's theory of the case was that Sewell undertook several acts—each of which, in a vacuum, would be unexceptional—but taken together, under "unusual" circumstances, establish his corrupt intent. According to the State, the circumstantial evidence that proved corrupt intent included: (1) Sewell appeared at a crime scene late at night dressed in plain clothes after receiving a call from Green; (2) Sewell reassigned the primary responsibility for investigating the Matthews incident from McGlotten to Barnes; (3) Sewell answered Barnes' questions about Matthews' sobriety on Matthews' behalf; and (4) Sewell instructed Barnes to write the incident as an accident. To place Sewell's discretionary acts in a context that showed they were improper and therefore corruptly motivated, the State offered testimony from McGlotten and Barnes, Sewell's subordinates, that Sewell's behavior was highly "unusual." The State also offered a potential motive for Sewell to act corruptly: Sewell, Green, and Matthews shared membership in the Prince Hall Masonic Lodge.

### 1. The Mason Connection

It is well established that mere membership in an organization—with aims that are legal or illegal—is insufficient to convict a person of a crime. *See, e.g.*, *Baird v. State Bar of Ariz.*, 401 U.S. 1, 9 (1971) (Stewart, J., concurring in judgment) (summarizing the Supreme Court's jurisprudence to conclude "that mere membership in an organization can never, by itself, be sufficient ground for a State's imposition of civil disabilities or criminal punishment"). Common membership in an organization may, of course, have relevance at a trial. *See e.g.*, *U.S. v. Beasley*, 72 F.3d 1518, 1527-28 (11th Cir. 1996) ("The First Amendment's protection of beliefs and associations does not preclude such evidence where

35

relevant to a trial issue."); *but see U.S. v. Lee Huen*, 118 F. 442, 463 (N.D.N.Y. 1902) (holding that "no rule of law [] justifies" an inference that a person would act with bias toward another person based solely on their common nationality).

Courts may look beyond the defendant's membership to the tenets of the organization, including any illegal aims the organization may have and the defendant's intent to participate in those illegal aims. *See, e.g.*, *Scales v. U.S.*, 367 U.S. 203, 229 (1961) (holding that, when a defendant is charged with furthering an organization's illegal aims, and that organization has both legal and illegal aims, the government must establish "clear proof that a defendant 'specifically intends to accomplish the [illegal] aims of the organization'") (citations, original alterations, and internal quotation marks omitted); *In re Braverman*, 271 Md. 196, 205-09 (1974) (summarizing and applying *Scales* and its progeny); *see also Cruz-Quintanilla v. State*, 455 Md. 35, 49 (2017) ("Because MS-13 has not been shown to be a religious or political organization with both illegal and legal aims, the evidence of the criminal nature of the gang alone was sufficient for sentencing purposes."). Even when the organization has illegal purposes, the prosecution must establish facts that tend to prove that the defendant's membership could motivate the defendant to commit the crime charged. *U.S. v. Dickens*, 775 F.2d 1056, 1058-59 (9th Cir. 1985) (holding that the defendant's association with a criminal organization "d[id] not demonstrate any motive for lying or . . . bias in connection with th[e] trial" because the crime was unrelated to the criminal organization and "since it was the defendant himself who was being cross-examined, rather than a witness, . . . the defendant's bias in his own behalf was self-evident"); *Ayala v. State*, 174 Md. App. 647, 664 (2007) (holding that a

36

defendant's membership in a gang that rivaled a gang to which the victim purportedly belonged was "probative in establishing motive").

When the defendant belongs to an organization with legal aims, such as the Masons, the State's burden is much higher.[9] *U.S. v. Arias-Izquierdo*, 449 F.3d 1168, 1180 (11th Cir. 2006) (distinguishing membership in a political party from membership in the Aryan Brotherhood because "[m]embership in a political party, by itself, does not necessarily signify anything about a person's truthfulness and is thus distinguishable from 'a secret prison sect sworn to perjury and self-protection'") (citation omitted). The State must offer admissible evidence specific to the case that tends to establish that the defendant's common membership motivated the defendant to act criminally. *Cf. Scythes v. Webb*, 307 F.2d 905, 909 (7th Cir. 1962) (holding that the government failed to adduce substantial evidence showing that the views of the leader of the Socialist Workers Party had "binding influence" on members of the organization). Otherwise, the State runs the grave risk of convicting persons based solely on their membership in an organization.

Applying these precepts to the instant case, the record reveals that the State Prosecutor adduced no evidence connecting Sewell's common membership in the Masons to the crime alleged. The indictment charged Sewell with "interfering with the legitimate

---

[9] Two cases from the Mississippi Court of Appeals are instructive. *Compare Burroughs v. State*, 767 So. 2d 246, 250 (Miss. Ct. App. 2000) (concluding that membership in a fraternity alone, without regard to an individual member's motive to lie, was insufficient to show witnesses' bias or motive) *with Dao v. State*, 984 So. 2d 352, 360 (Miss. Ct. App. 2007) (distinguishing the facts of *Burroughs* because "[g]ang members are more likely to testify in favor of one another because the failure of a member to uphold the tenets of a gang could subject him to severe penalties").

investigation of a motor vehicle accident by subordinate police officers for the personal benefit of an acquaintance," but the State proved only that Sewell and Matthews were both Masons, not that they were acquaintances. When Matthews testified that he called Green following his crash, the State did not ask if he knew Green from the lodge or if he got Green's business card at a Masons event. The State did not ask Matthews any questions about Sewell or any relationship the two men may have had.

On direct, Sewell testified that Matthews' membership in the Prince Hall Masonic Lodge did not affect his decision-making and asserted: "If Mr. Matthews did not call the police that night, Mr. Matthews would have been arrested for a hit and run. The mere fact that Mr. Matthews called the police made it an accident and not a hit and run." The State Prosecutor, while cross-examining Sewell, failed to adduce any evidence that Sewell and Matthews had any prior relationship or ever met at Mason events. Instead, the State only questioned Sewell in regard to his common membership in the Masons:

> Q. Knowing that you're a fellow [M]ason of Doug Matthews, didn't you think it was inappropriate for you to go handle that call when there's plenty of experienced officers already there?
>
> A. Officer Barnes handled the call. I didn't handle the call. As I've done many times, I've showed up on many calls, so that's not unusual for me to do that.
>
> Q. I know. *But considering this is a fellow [M]ason* and Lieutenant Green has called you and told you about an accident and there's people there, *wouldn't it be inappropriate for you to even go as chief and take over this investigation?*
>
> A. No, sir. No. I've responded to calls where countless people are involved in situations. I've run to those calls as well.

(Emphasis added).

38

The State failed to prove that Sewell was even an active member of the Masons. Anthony Tull, who the State called as a witness, confirmed that Sewell was a relatively new member of the lodge who attended "maybe at the most four or five meetings" after he moved to Pocomoke City. Nor did the State prove that Sewell harbored any feelings of loyalty toward other Masons that may have permitted the jury to infer that he would act corruptly in public office on behalf of a fellow Mason. *Compare State v. Williams*, 871 A.2d 744, 753-54 (N.J. App. Div. 2005) (affirming the dismissal of a juror based on the juror's stated adherence of loyalty toward fellow Masons); *with Dowdye v. Virgin Islands*, 55 V.I. 736, 751-54 (2011) (holding that voir dire questions into Mason membership were proper to show juror bias but that dismissal of juror based on membership in the Masons was unconstitutional without first determining the juror was unable to perform his duties).[10] In fact, when questioned, Sewell testified that he handled the Matthews call just as he had handled many others, and nothing was unusual to him.

In short, the State failed to demonstrate any prior acquaintance between Sewell and Matthews or any relevant connection between Sewell and the Masons that, when viewed in the light most favorable to the State, could lead a reasonable jury to conclude that Sewell acted corruptly in furtherance of his membership in the Masons. *See Neal*, 191 Md. at 314; *Painter,* 157 Md. App. at 10-11. Common membership alone, without more, was not competent to prove Sewell acted with corrupt intent.

---

[10] *See, e.g.*, *Walton v. U.S.*, 184 F. Supp. 2d 773, 776 (N.D. Ill. 2002) (rejecting the defendant's claim that all drug laws are invalid because members of Congress are secret members of the Freemasons).

39

## 2. Sewell's "Unusual" Behavior

The State's failure to prove Sewell's motive is not dispositive. The State contends, "[w]hile it was certainly the State's theory that Sewell and Matthews' membership in the Mason brotherhood was *the reason* Sewell interfered on Matthews' behalf, there was far more evidence proving that Sewell did, in fact, interfere with the investigation into Matthews' hit-and-run."

As Judge Moylan has explained for this Court, "[s]howing that a defendant had a motive to commit a crime simply helps to establish that he had the requisite *intent* to commit the crime." *Emory v. State*, 101 Md. App. 585, 606 (1994); *cf. Ayers v. State*, 335 Md. 602, 634-35 (1994) (holding that circumstantial proof of a racial motivation was of "vital importance" to proving the defendant committed a hate crime). It is a long-established principle that "[t]he absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction." *Pointer v. U.S.*, 151 U.S. 396, 414 (1894) (Harlan, J.).[11] In the context of

---

[11] Although courts recite this principle most frequently in murder cases, it applies equally in the context of other specific intent crimes. *See, e.g.*, *U.S. v. Croteau*, 819 F.3d 1293, 1306 (11th Cir.), *cert. denied,* 137 S. Ct. 254 (2016) (holding that, in a trial for making fraudulent tax returns, "the government was not required to prove motive—it was simply required to prove knowledge of falsity—and in doing so it was allowed to rely on circumstantial evidence in establishing knowledge"); *U.S. v. Gardner*, 211 F.3d 1049, 1053 (7th Cir. 2000) (holding, in an arson case, that even without proof of motive a jury could have concluded from circumstantial evidence that the defendant acted with specific intent); *Winer v. State*, 950 A.2d 642, 647-48 (Del. 2008) (observing that, "[a]lthough the State's case would have been stronger" if it proved motive, "the State may prove a defendant's guilt exclusively through circumstantial evidence, and [] a jury may infer intent from the defendant's conduct"); *State v. Franklin*, 956 So. 2d 823, 834 (La. Ct. App.

cases charging misconduct in office, once again we observe Chief Judge Marbury's instruction:

> It is undoubtedly true that the doing by a public official of an act which he ought not to do carries with it some measure of willfulness and bad intent, and may be induced by corrupt motive, but these are only necessary or probable accompaniments. They may also accompany the doing of a lawful act unlawfully, which is misfeasance. The test seems to be in the nature of the act, and not in the motive by which it is done.

*Carter*, 200 Md. at 263.

Throughout Sewell's trial, the State Prosecutor elicited testimony from Sewell's subordinates that his handling of the Matthews investigation was unusual and out of the ordinary.[12] Although the State failed to prove that Sewell had a motive to help Matthews,

---

2007), *amended on reh'g* (June 14, 2007) (holding, in a forgery case with no proof of motive, that the State could prove specific intent through circumstantial evidence); *State v. Johnson*, 174 P.3d 654, 658 (Utah Ct. App. 2007) (holding, in an action for knowingly making false statements, the State need not prove motive but can instead create an inference of the defendant's knowledge through circumstantial evidence).

[12] As the dissent illustrates, each incident or "behavior"—when considered in isolation—may also reflect a good or bad (non-corrupt) intention. But we agree with the State that the jury views these incidences collectively, rather than in a vacuum, and we, in turn, look at them in the light most favorable to the State. *See Hardrick*, 671 N.W.2d at 552 (ruling that corrupt intent in a case for misconduct in office is a question for the trier of fact); *see also Donati v. State*, 215 Md. App. at 718 (observing that, when reviewing the sufficiency of the evidence, we view the evidence and any reasonable inferences therefrom in the light most favorable to the State). The dissent concludes that because at least three species of intent might be evidenced by the same "unusual" behaviors in this case, "nothing plus nothing equals nothing." Slip Op., dissent at pp. 3-4. Thus, the dissent rejects the idea that the State's evidence "cumulatively is more than the sum of its parts." *Id.* But our cases make clear that circumstantial evidence does not "depend upon one strand, but is made up of a union and combination of the strength of all its strands." *Hebron v. State*, 331 Md. 219, 228 (1993) (internal quotations omitted). The Court of Appeals in *Hebron* noted, "'[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand. . . . It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors.

41

the State presented circumstantial evidence showing his conduct was so unusual that it could permit an inference of corrupt intent—in some respects, similar to the corrupt intent that may be inferred from "the doing of an act which a person ought not to do at all" in cases of malfeasance. *Id.* at 262.

The scope of our review requires us to assess the evidence in the light most favorable to the State. *Donati*, 215 Md. App. at 718. Therefore, we must credit the testimony of Sewell's subordinates over that of Sewell when they conflict. Both McGlotten and Barnes testified repeatedly that Sewell's behavior that night was "unusual" and "out of the ordinary." McGlotten told the jury that it was unusual for Sewell to arrive at the scene of a "basic accident," especially at "that time of night," and unusual for him to be in plain clothes. Both officers testified that the way Sewell paused before reassigning the case was also unusual. McGlotten testified that, typically and customarily, the officer who is originally assigned to the case is the officer who handles that case. Further, Barnes related to the jury that the way Sewell interrupted her as she asked Matthews questions about his sobriety, and then supplied Matthews' answers on his behalf, was unusual. She claimed that she only wrote the incident as an accident because Sewell instructed her to do so. A reasonable jury could have concluded that this conduct was improper, and, together with other evidence concerning the accident—would permit an inference that Sewell intended

The rule does not require that the jury be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt.'" *Id*. at 227 (quoting 3 *Wharton's Criminal Evidence* § 980, p. 477 (12th ed.1955)).

to corruptly influence the investigation. *See Rose v. Clark,* 478 U.S. 570, 581 (1986) (observing that in "many cases . . . there is no direct evidence of intent").

The facts of the accident itself permitted an inference that Matthews' testimony was not fully credible. Matthews testified that he fell asleep within four or five blocks of leaving the Prince Hall Masonic Lodge, causing him to strike two parked cars with sufficient force to lose a wheel on his own vehicle. Rather than stopping to report the accident or assess the damage, he "maneuvered" his three-wheeled vehicle around two turns and continued home. Once home, he called Green rather than 9-1-1.[13] Matthews offered no explanation for any of his behavior other than that he "panicked."

We hold that the facts surrounding the accident and the testimony concerning the subsequent investigation, together with the reasonable inferences drawn therefrom, were sufficient to permit the jury to conclude that Sewell's actions were corrupt and not just a mere error of judgment.

### C. The Admissibility of Expert Testimony

In his defense, Sewell attempted to call expert witnesses to place his decision-making surrounding the Matthews incident in the context of a police chief's legitimate duties and proper considerations under the circumstances. Sewell proffered that his experts

---

[13] We note that, even if the State proved that Green and Matthews were acquainted through their membership in the Prince Hall Masonic Lodge, there was no similar acquaintance established between Matthews and Sewell. The jury's rejection of the conspiracy theory implies that they rejected the entire Mason connection as relevant to this case.

43

would testify to the discretion a chief of police enjoys and the objectives—particularly those relevant to a small community—that a chief must consider during an investigation.

In response to the State's motion to exclude his experts, Sewell's counsel argued that expert testimony would provide the jury with an understanding of the scope of a police chief's discretion. Moreover, it would help the jury view the facts of the case in light of that discretion, including "the discretion on a scene to reach conclusions and share those conclusions with subordinates in the interests of promoting efficiency[,]" and the "numerous legitimate and lawful explanations" for the behavior alleged. This expert testimony was necessary, Sewell's counsel continued, because it would inform the jury that, "[w]hether and how to approach an investigation or to reach any conclusion requires not only assessing the facts at hand *but also considering many other law enforcement objectives*." (Emphasis added). Specifically, regarding law enforcement in smaller communities, counsel explained that the expert testimony would illuminate how "officials must consider the potential downsides of over-prosecution or over-citation[,]" and that "supervisors, especially experienced officers such as the Chief, have the discretion on a scene to reach conclusions and share those conclusions with subordinates in the interests of promoting efficiency."

At the November 22 motions hearing, the State Prosecutor argued that

> What [Sewell]'s charged with is interfering with an investigation by subordinate officers. And by allowing this [expert] testimony, we've shifted the issue and it's presenting to the jury that this was a matter of whether he abused his discretion or didn't abuse his discretion in an investigation which is really a separate issue. So . . . it is going to make it into an issue that maybe is more favorable to the defense, but is not what Mr. Sewell is charged with.

44

. . . this doesn't go to Mr. Sewell's discretion in an arrest. It goes to whether there was a conspiracy that he's been charged with and whether, based on that conspiracy, they interfered with the action of subordinate officers.

Sewell's counsel advised the court, however, that the State would have to demonstrate beyond a reasonable doubt that Sewell engaged in corrupt behavior in the exercise of official duties and underscored the point that "this conduct . . . has to be a willful [] abuse of authority. This is a specific intent offense, and it is dependent upon what is in our client's mind at the time." Counsel further explained that the expert may demonstrate that Sewell's "conduct was objectively reasonable under the circumstances" and that, based on his "extensive law enforcement experience," Sewell's conduct was "reasonable and within the permissible scope of his discretion." This reasonableness, Sewell's counsel suggested, "negates the proposition that he act[ed] with the necessary corrupt intent."

The trial judge suggested that "willful is a word that a jury can understand" and opined that "what is reasonable" is also a question for the jury. The State then added that expert testimony "could tend to mislead or confuse the jury" by shifting the issue from whether Sewell interfered with an investigation by subordinate officers to "whether he abused his discretion or didn't abuse his discretion in an investigation, which is really a separate issue." Sewell's counsel replied that understanding whether Sewell acted "within the heartland of the way supervisory police officers act in these kinds of cases . . . would help the jury figure this case out[.]"

Before this Court, Sewell maintains the trial court's summary, pre-trial ruling granting the State's motion to exclude his experts was erroneous. He urges that "[t]he

45

critical problem" with the State's position and the trial court's ruling, "is that whether or not he abused his discretion directly informs whether or not Chief Sewell intended to abuse his authority and commit misconduct." Therefore, Sewell avers that without expert testimony on the scope of police discretion, "the jury had no baseline to assess how police investigations are conducted, what supervisors on a scene are entitled to do, or when and how citations are issued—in short, what is a deviation from the norm that raises red flags or from which misconduct may be inferred."

The State persists that Sewell's argument "ignore[s] the fact that Sewell was not charged with abusing his discretion by failing to issue traffic citations to Matthews." As it did before the circuit court, the State insists: "Whether, *absent corrupt intent*, it would have been an appropriate exercise of Sewell's discretion to decline to issue Matthews traffic citations is irrelevant." (Emphasis added).

We cannot sign on to the State's circular argument that whether Sewell abused his discretion is irrelevant to the question of whether he interfered in an investigation. The State put the scope of Sewell's discretion squarely at the center of its case by offering circumstantial evidence of corrupt intent, *viz.,* that his actions were unusual and out of the ordinary. Whether Sewell properly exercised his discretion is clearly relevant to the determination of whether his "unusual" conduct was corrupt.

### 1.  Applicable Law

A trial judge weighing the admissibility of expert testimony should base his or her determination on three main findings: (1) "whether the evidence to be presented is a proper subject for expert testimony[;]" (2) "whether the proposed expert is qualified to testify by

46

virtue of education and experience[;]" and (3) whether the proposed expert is competent, "that is, the expert's conclusions must be based upon a legally sufficient factual foundation." *Simmons v. State*, 313 Md. 33, 41-42 (1988) (citations omitted). The first of these determinations is the central issue on appeal.

Maryland Rule 5-702 provides that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." When a criminal defendant in Maryland seeks to admit expert testimony, we begin with the baseline that "[t]he criminal defendant is generally permitted to introduce any evidence relevant to the asserted defense." *Simmons*, 313 Md. at 41; *see also State v. Smullen*, 380 Md. 233, 268 (2004) ("The requirement of relevance applies not just to factual evidence but to expert testimony as well.").

Relevant evidence includes that which "tends to establish or disprove a material fact." *Simmons*, 313 Md. at 41 (citations omitted). In the context of expert testimony, the Court of Appeals has opined that, "[t]o be relevant, expert testimony need only provide the fact-finder with 'appreciable help . . . in resolving the issues presented in the case.'" *Thanos v. State*, 330 Md. 77, 95 (1993) (quoting *Simmons*, 313 Md. at 41). Expert testimony is not required "on matters of which the jurors would be aware by virtue of common knowledge[,]" *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 257 (1996), *aff'd*, 346 Md. 122 (1997), but "[i]t is well settled that expert testimony is required 'when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman.'" *Wood v.*

47

*Toyota Motor Corp.*, 134 Md. App. 512, 518 (2000) (citations omitted). Judge Moylan once opined that "the acid test" is "whether we three members of a judicial appellate panel would, were we fact-finding jurors, have found the testimony helpful." *Yount v. State*, 99 Md. App. 207, 212 (1994). The outcome turns on whether the testimony would be useful to the jury, *not* "whether the trier of fact could possibly decide the issue without the expert testimony." *Sippio v. State*, 350 Md. 633, 649 (1998). Relevance is a question of law, which we review *de novo*. *Williams v. State*, 457 Md. 551, 564 (2018); *see also Walter v. State*, ___ Md. App. ___, ___, No. 814, Sept. Term, 2017, slip op. at 13 (reviewing *de novo* the relevance of the State's expert witness).

But expert testimony, like other evidence, is subject to Maryland Rule 5-403, which permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Maryland Rules afford trial courts broad discretion "to determine whether proffered testimony has a credible foundation and is relevant to the facts of a given case." *Bomas v. State*, 412 Md. 392, 417-18 (2010). On appeal, "[i]n the absence of an error of law or fact, we review the admission of expert testimony for abuse of discretion." *Alford v. State*, 236 Md. App. 57, 71 (2018). The Court of Appeals has defined the abuse of discretion standard "as 'discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Schade v. Md. State Bd. of Elections*, 401 Md. 1, 34 (2007) (citations omitted).

## 2.  Determining Relevance

On the matter of relevance, we conclude that Sewell's proffered expert testimony was relevant because it could have shown that his actions were reasonable and proper in light of the special considerations a police chief confronts in exercising his or her discretion.  Therefore, the expert testimony could have directly rebutted the State's circumstantial evidence of corrupt intent, an element of the crime charged.

We begin our survey of the relevant cases with the Court of Appeals' decision in *Simmons v. State*, 313 Md. 33 (1988).  In *Simmons*, the Court considered the propriety of a trial judge's decision to exclude a psychiatric expert from testifying about the reasonableness of the defendant's "subjective belief that self-defense was necessary to avoid imminent death or serious bodily injury."  313 Md. at 35.  Simmons proffered, in part, that his expert would only testify that Simmons' "asserted subjective belief would be consistent with his psychiatric profile."  *Id.* at 36.  The State argued that the proposed testimony should be excluded because the testimony regarding the nature of Simmons' subjective beliefs at the time of the crime would impermissibly impinge on the jury's function.  *Id*. at 35-36.  The trial judge granted the State's motion to exclude, reasoning that such testimony would usurp the role of the jury, and "indicating that he would allow no one to testify as to what Simmons' thought processes were at the time of the homicide." *Id.* at 35, 40.

After this Court affirmed, the Court of Appeals reversed, holding that the trial court erred to the extent that it precluded Simmons' expert from testifying as to the conclusions she reached concerning his psychological profile.  *Id.* at 46.  The Court ruled the

defendant's psychological profile was an admissible ground for testimony, limited to "the expert's diagnosis of the defendant, characteristics of the defendant's personality disorder, and the impact which the disorder generally has on a person's perceptions and behavior." *Id.* at 46-47 (citations omitted). The Court observed that "expert testimony frequently is offered as to a defendant's subjective beliefs when the defendant seeks complete justification for a homicide by asserting self-defense." *Id.* at 47. Looking to the elements of the crime charged, the Court noted that, in a murder trial, the State must prove that the defendant possessed "the requisite malevolent state of mind"; when the defendant asserts an imperfect self-defense, the parties "necessarily present conflicting evidence as to the presence or absence of a mitigating factor" (i.e., whether the defendant's honestly held subjective belief that use of force was necessary was reasonable under the circumstances). *Id.* at 40. According to the Court, such testimony "tended to prove an element of imperfect self-defense[:]" that the defendant "honestly believed that the use of force was necessary to avoid serious bodily injury[.]" *Id.* at 39-40. More specifically, the expert testimony was relevant because showing "consistency between the specific subjective belief testified to by Simmons and Simmons' psychological profile tend[ed] to make it more likely that Simmons in fact held that subjective belief." *Id.* at 48. Because the trial judge did not "appreciate[]" that expert testimony on Simmons' psychological profile was admissible, the Court of Appeals concluded that its decision to exclude the evidence was not an exercise of discretion but an error as a matter of law. *Id.*; *cf. Wallace-Bey v. State*, 234 Md. App. 501, 542-43 (2017) (reversing, as an error of law, a trial court's limitations on a

50

defense-expert's testimony that tended to establish an element of her defense based on the trial court's erroneous conclusion that the statements contained hearsay).

In *Smith v. State*, 423 Md. 573 (2011), the Court of Appeals reversed a trial court's exclusion of evidence relevant to the defense's case. Smith stood trial for the murder of his roommate; his defense was that his roommate committed suicide, which became the central issue of the trial. *Id.* at 581. Both sides presented expert testimony tending to prove or refute the fact that Smith's roommate committed suicide and the State presented lay testimony from several witnesses about the roommate's state of mind leading up to his death. *Id.* at 581, 584. Despite this, the trial court excluded evidence proffered by Smith that went to the roommate's state of mind. *Id.* at 586-87. The evidence that was excluded was testimony from a State Trooper, who testified outside of the presence of the jury, that he had observed the roommate during a DWI arrest appearing to be depressed and stressed. *Id.* at 586. According to the State Trooper, the roommate said, "this is the last thing I need in my life right now, on top of all the other [] shit going on in my life." *Id.* at 586. The trial court ruled that the officer's testimony was inadmissible as "not helpful" and "so remote from the factual situation." *Id.*

On appeal, Smith argued that the proffered testimony was relevant and admissible. *Id.* at 588. The Court of Appeals agreed. As relevant to the case before us, the Court in *Smith* considered whether the proffered testimony was material to the proposition that Smith sought to prove: that the manner of his roommate's death was suicide. *Id.* at 590. To be material, the Court explained, the testimony "need only have a 'tendency' to make that proposition 'more probable.'" *Id.* at 590 (citing Md. Rule 5-401). The Court rejected

51

the State's attempts to view materiality "in a vacuum," noting that, "at the time of the []

proffer, the defense had produced its forensic experts' testimony contradicting the State's

opinion evidence. And, Dr. DiMaio had opined that the manner of death was suicide." *Id.*

Viewed in this context, the testimony "ma[de] it more probable, in conjunction with the

opinions of the defense forensic experts, that the defense's ultimate proposition of suicide

might be accepted." *Id.* Therefore, the Court held, "[t]he proffered proof was material-

consequential." *Id.* at 591.

Also instructive in our analysis, although not controlling of the ultimate issue in this

criminal case, are negligence cases in which the courts consider the need for expert

testimony.[14] Maryland courts have held that expert testimony was proper (or even

necessary) to assist a fact-finder in understanding ordinary professional standards within a

trade. *See, e.g.*, *Sage Title Grp., LLC v. Roman*, 455 Md. 188, 218-19, *reconsideration*

*denied* (2017) (holding that a title company's standard of care was "beyond the ken of the

average layman[,]" because most people likely do not have "experience involving

---

[14] Our inquiry in Sewell's criminal appeal is less searching than in standard-of-care cases. In those cases, the issue is whether the party bearing the burden of proof was *required* (but failed) to produce expert testimony to establish the standard of care that governed the defendant's behavior. By contrast, our concern here is whether Sewell, who, as "a criminal defendant is generally permitted to introduce any evidence relevant to the asserted defense," demonstrated that his experts' testimony would have been "'rationally based and . . . helpful to the fact-finder.'" *Simmons*, 313 Md. at 41, 43 (citations omitted); *see also Smullen*, 380 Md. at 261 n.8 (noting that "Maryland Rule 5-402 makes clear that, unless rendered inadmissible by other law, all relevant evidence is admissible, and . . . a defendant has a Due Process Constitutional right to mount a defense and have considered relevant and admissible evidence in support of that defense"). The negligence cases are nonetheless helpful, though, because the courts in those cases examine a lay jury's familiarity with the standards that govern the industry at issue.

transactions with a title company[,]" and that "a customer of a title company or third party would not be aware of the policies and procedures, if any, that a title company had in place with regard to handling its escrow account").    This Court recently addressed the need for expert testimony to explain "[t]he standards that govern proper staffing and workplace safety for railroads" in *Shutter v. CSX Transp., Inc.*, 226 Md. App. 623, 642 (2016).  That case involved a railroad employee's Federal Employers' Liability Act ("FELA") claim that she suffered workplace injuries because of CSX's negligence.  *Id.* at 630.  She alleged that CSX had "negligently assign[ed] her to physically demanding work performed often times on a repetitive basis, with irregular motions and unnatural postures of the body and without adequate help," causing her injuries.  *Id.* (alteration in *Shutter*) (internal quotations omitted).  Specifically, Shutter alleged "that CSX had been negligent by assigning her work beyond her physical capacity[,] not providing her a safe work environment[,]" and by "not replacing her coworker after he was discharged so that she ended up doing the work of two people."  *Id.* at 642.  Prior to trial, the court granted CSX's motion to preclude one of Shutter's experts, Dr. Nussbaum, from testifying due to his untimely witness designation, and also granted CSX's motion for summary judgment "on the ground that without an expert witness on the applicable standard of care for a 'line of road' position, Shutter could not prove negligence."  *Id.* at 634.

On appeal, Shutter argued that the court abused its discretion in precluding Dr. Nussbaum's testimony and in granting summary judgment.  *Id.* at 641.  We concluded that summary judgment was proper because the issue of whether CSX "breached prevailing standards of care by creating an unsafe work environment for Shutter by its assignments to

53

her and its decision not to replace her co-worker is not one that can be answered by lay people serving as jurors in the absence of expert testimony." *Id.* at 642 (citations omitted). Expert testimony was necessary because lay jurors are unaware of the standards governing "proper staffing and workplace safety for railroads[.]" *Id.*

The Court of Appeals considered the need for expert testimony on the applicable standard of care for deputy sheriffs in *Jones v. State*, 425 Md. 1 (2012), a case dealing with a citizen's civil action against the State for the negligent training of its officers. Kimberly Jones answered her apartment door after she was awakened by knocking and someone shouting out "'it's the sheriff's department.'" *Id.* at 8-9. As soon as she opened the door, a deputy sheriff put his foot inside her door and, without a warrant in hand, announced that he was going to enter the apartment to search for a man, who Ms. Jones told him was not there. *Id.* He then "hit" Ms. Jones — "a close-fisted punch to her face, which knocked her against a closet door behind her." *Id.* at 9. Then another deputy shattered the glass patio door to her apartment with his baton and entered through the back. *Id.* Before the altercation ended, Ms. Jones "was sprayed with pepper spray, beaten with a baton, and had a portion of her hair pulled from her scalp." *Id.* at 10.

Ms. Jones brought an action against the deputy sheriffs and the State of Maryland pleading 12 counts, including false imprisonment, battery, intentional infliction of emotional distress, negligent retention and negligent training and supervision. *Id.* at 11. At the end of Ms. Jones' case in a bifurcated trial on the negligence claims, the State moved for judgment, arguing, among other things, that Ms. Jones failed to present expert testimony to show that the deputies' training deviated from generally acceptable training

54

standards. *Id.* at 15. The circuit court denied the motion, and this Court reversed. The Court of Appeals reversed our decision, however, concluding that the jury "needed only its 'common knowledge or experience' to understand that an officer violates the Fourth Amendment if the officer crosses the threshold of a home (here, by placing his foot in a home's doorway in order to block the door from closing) without proper authority for doing so." *Id.* at 28 (citation omitted). The Court emphasized "that experts are not needed when 'the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care.'" *Id.* at 26 (quoting *Shultz v. Bank of Am., N.A.*, 413 Md. 15, 29 (2010)). Because the Fourth Amendment set the standard of care and "could be, and was, explained by the trial judge during jury instructions[,]" testimony by an expert witness was unnecessary. *Id.* at 27. The Court did note, however, while addressing the public-duty doctrine, that "'[p]ublic officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the unflinching discharge of their duties[.]'" *Id.* at 21 (quoting *Asburn v. Anne Arundel Cty.*, 306 Md. 617, 629 (1986)).

Returning to the case before us, the trial judge seemed to accept the State Prosecutor's argument that testimony on the scope of a police chief's discretion "w[ould] not assist the trier of fact [] to understand the evidence or to determine a fact in issue," but would instead "tend to confuse the jury by misdirecting their attention away from the real issue." Consistent with this (mis)understanding, in a colloquy with Sewell's counsel, the trial judge opined that expert testimony was unnecessary because a lay jury would

55

understand the meaning of words like "willful" and "reasonable." But the meaning of those words was inapposite to Sewell's argument that, to show that his actions were not corrupt, he needed expert testimony on the issue of what is normal and consistent behavior within the scope of a police chief's discretion. *Cf. Sippio*, 350 Md. at 649 (explaining that the standard for admitting expert testimony is the usefulness of the evidence, not "whether the trier of fact could possibly decide the issue without expert testimony").

Unlike in this case, the defendants in *Jones* were charged with a violation of a constitutionally based standard of care, which was well within the jury's common knowledge to decide under the facts of that case. Sewell, however, was charged with official misconduct and the State's circumstantial evidence of corrupt intent placed at issue the scope of Sewell's discretion as a police chief—something beyond the ken of the average juror. *See supra* Part A.1. Sewell proffered expert testimony to refute the State's circumstantial evidence of corrupt intent by demonstrating that his decision-making regarding the Matthews incident was not "unusual," but proper and consistent with how a small-town police chief would typically exercise his or her discretion under similar circumstances.

We should not view the relevance of Sewell's proffered evidence in a vacuum. *See Smith*, 423 Md. at 590. At trial, the State's witnesses called into question the reasonableness of Sewell's discretionary acts. The court then permitted Sewell to testify, without objection, that his actions throughout the investigation were an exercise of his discretion. In fact, the trial court's jury instructions included the following description of an officer's discretion:

Law enforcement officials have discretion to issue citations and make arrests. Discretion in this context means that police officers are not required to make arrest or issue citations even if they have probable cause to believe that a person committed or is committing a violation. You may consider the fact that police officers are not required to make arrests or issue citations even if they have probable cause in determining whether or not [Sewell's] conduct constitutes corrupt action beyond a mere error in judgment.

With the scope of discretion at issue, the proffered evidence "ma[de] it more probable, in conjunction with [the other evidence presented], that the defense's ultimate proposition . . . might be accepted." *Id.* at 491. As in the *Simmons* case, Sewell's expert testimony would have been relevant to an element of the crime with which Sewell was charged: Sewell's intent. *See Simmons*, 313 Md. at 40. The State Prosecutor's proof of Sewell's corrupt intent depended largely on two subordinate officers, McGlotten and Barnes, who testified that Sewell's handling of the Matthews' investigation was out of the ordinary and strongly implied that they disagreed with Sewell's decisions. Sewell attempted to rebut this circumstantial evidence of corrupt intent by showing that his behavior was consistent with the ways in which a small-town police chief would exercise his or her discretion when confronting a similar set of facts. Applying Judge Moylan's "acid test," we, as appellate judges, cannot say that we know the accepted processes and objectives that a captain of police should employ and consider in choosing when to reassign officers on an ongoing investigation and when to exercise his or her official discretion to not issue a citation following an investigation. *See Yount*, 99 Md. at 212. For example, Sewell testified that he divided Pocomoke City into sectors based on Compstat data and explained that the Compstat program allowed him to track the day-to-day work of his officers. He testified that it was this structure that made "post integrity" important to his

57

Department. How the necessity of insisting that officers maintain integrity in which posts they patrol would affect a police chief's discretion when confronted with the facts of this case is beyond our lay understanding of the innerworkings of policing and the structure of police departments.

Although lay jurors may have first-hand experience interacting with police officers during a traffic stop, they are unlikely to "be aware of the policies and procedures" that a police department has in place regarding the internal handling of investigations, or the broad discretion the officers enjoy in assigning personnel and handling cases. *See Sage Title Grp.*, 455 Md. at 218-19; *see also Jones*, 425 Md. at 21 (noting the breadth of law enforcement's discretion). Accordingly, we conclude that Sewell's proffered expert testimony was relevant in that it tended to make more probable Sewell's defense that he did not possess corrupt intent, and the trial court's failure to appreciate this was an error of law.

### 3. Excluding Relevant Evidence

As we explained above, the trial court ruled both that Sewell's proffered expert testimony "w[ould] not assist the trier of fact" (*i.e.*, was not relevant), and that it would instead "tend to confuse the jury by misdirecting their attention away from the real issue." To the extent this latter ruling reflected an exercise of the court's discretion to exclude otherwise relevant evidence under Maryland Rule 5-403, we conclude that the court abused its discretion.

Maryland Rule 5-403 permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

58

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

We cannot glean from the trial court's cursory ruling that the court weighed any perceived likelihood of confusion against the probative value of Sewell's expert witnesses' testimony. For one, nothing in the record suggests that expert witness testimony on police discretion would confuse the jury, especially since the trial court ultimately permitted Sewell to testify about the scope of his discretion and the court instructed the jury on a police officer's discretion. The State could have offered its own experts on the subject. More importantly, the trial court could not have properly balanced the probative value of Sewell's proffered expert testimony because the court erroneously found that the evidence was not relevant to begin with. We conclude, therefore, that the trial judge in this case excluded Sewell's expert testimony "on untenable grounds[] or for untenable reasons[;]" its decision to do so was an abuse of discretion. *See Schade*, 401 Md. at 34.

### 4. Prejudicial Error

Having found that the trial court erred by excluding Sewell's experts from testifying, we must now consider whether this error was harmless or prejudicial. *See Ragland v. State*, 385 Md. 706, 726-27 (2005). When a criminal defendant establishes error on appeal, the burden falls to the State to prove, beyond a reasonable doubt, that the error was harmless.[15] *See Dionas v. State*, 436 Md. 97, 108 (2013). Earlier this year, Judge Adkins, writing for the Court of Appeals, reiterated that in applying the harmless error test, the "proper

---

[15] We note that the State, in its response brief, does not argue that the exclusion of Sewell's expert witnesses was harmless error.

inquiry" is "'whether the trial court's error was unimportant in relation to everything else the jury considered in reaching its verdict.'" *Devincentz v. State*, 460 Md. 518 (2018) (quoting *Dionas*, 436 Md. at 118). In cases in which "credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness'[s] credibility is not harmless error." *Dionas*, 436 Md. at 110.

Credibility was a principal component in the State's case against Sewell. As we discussed earlier regarding the sufficiency of the State's evidence, the State elicited testimony repeatedly from Sewell's subordinates that his behavior was "unusual." These perceived deviations from the ordinary permitted the inference that Sewell acted with corrupt intent. In his own testimony, Sewell testified that his behavior was not, in fact, unusual; instead, he insisted that he behaved consistent with the way he believed a police chief should under the circumstances. Sewell's proffered experts would have supported his testimony. The one expert opined in his affidavit that "it would have been within Chief Sewell's discretion to answer inquiries from Officer Barnes[,]" and that "supervisors or officers in a supervisory position are within their discretion to delegate various responsibilities, including the writing of an accident report." This testimony would have aided "the jury's assessment of who is telling the truth." *Dionas*, 436 Md. at 110.

Further, at the time the State Prosecutor brought its case against Sewell, he had pending discrimination actions against the Department and the Worcester County Sheriff's Office—the employers of several of the State's fact witnesses. For obvious reasons, Sewell may not have been able to have witnesses from these offices testify on his behalf. Accordingly, the inability to present *independent* expert testimony on the processes by

60

which a police chief generally exercises his or her discretion left Sewell severely disadvantaged—especially given that officers from the Department, such as Officer Barnes, testified as to their own perceptions of Sewell's decision. Given that the trial court's error was one "affecting the jury's ability to assess a witness'[s] credibility," *id.*, it was not harmless error. We will, therefore, grant Sewell a new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED; CASE REMANDED FOR A NEW TRIAL. WORCESTER COUNTY TO PAY COSTS.**

Circuit Court for Worcester County
Case No. 23-K-16-000289

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2183

September Term, 2016

—————————————————————

KELVIN SEWELL

v.

STATE OF MARYLAND

—————————————————————

Wright,
Leahy,
Friedman,

JJ.

—————————————————————

Dissenting Opinion by Friedman, J.

—————————————————————

Filed: November 29, 2018

It seems a shame to dissent from such a fine opinion, an opinion that has taken so much work (not just by its author, but by the whole panel) and an opinion that I agree with in such a large part.

Because my relatively minor disagreement with my colleagues would require a different outcome, however, I feel compelled to dissent.

Before I reach that disagreement, it is worth noting the many grounds on which I agree with the majority's opinion. I agree that Sewell was not entitled to a hearing on his motion to dismiss based on allegations of prosecutorial misconduct. Slip Op. at 23-27. I agree that in a prosecution for misconduct in office, the State must prove that the defendant acted with a corrupt intent. Slip Op. at 27-32. I agree that the State's evidence that Sewell, Matthews, and even Greene were all members of the Prince Hall Masons "was not competent to prove that Sewell acted with corrupt intent." Slip Op. at 35-39. Moreover, I would agree with my colleagues that the trial court abused its discretion by excluding the testimony of Sewell's experts. Slip Op. at 43-57.

My sole disagreement with my colleagues is with their conclusion that the testimony of two subordinate police officers, McGlotten and Barnes, that Sewell's behavior was "unusual" was sufficient evidence to get the State's case to the jury. Slip Op. at 35. For the reasons that I shall explain in this brief dissent, I find the State's evidence to have been insufficient. The question of corrupt intent is one for the jury. Slip Op. at 41-42 n. 12. However, when the question of intent can only be answered by speculation, the issue of intent is not permitted to go to the jury. *Bible v. State*, 411 Md. 138, 160 (2009) (plurality opinion) (reasoning that while there was *suspicion* that Bible's actions could be explained

by a convictable intent—touching a child for sexual gratification—mere suspicion was insufficient for conviction because it forced the jury to speculate). As a result, it is my view that the trial court erred in denying Sewell's motions for judgment of acquittal. I would therefore reverse Sewell's conviction and hold that retrial is barred by double jeopardy. *See Scott v. State*, 454 Md. 146, 167 (2017), *cert. denied*, 138 S. Ct. 652 (2018).

## I.

The majority has correctly described a "continuum of proof" that the State must offer in misconduct in office cases. Slip Op. at 32. When the act alleged to be misconduct is a crime—say, theft or fraud—we have not required separate proof of intent. *State v. Carter*, 200 Md. 255, 263 (1952). Similarly, where the act alleged to be misconduct is palpably wrongful—say, forcing a subordinate to empty one's catheter bag of urine—we have not required separate proof of corrupt intent either. *Leopold v. State*, 216 Md. App. 586 (2014). By contrast, however, when the act alleged to be misconduct is, at least from the outside, completely indistinguishable from the ordinary, discretionary acts of a faithful public servant, the need for the State to show evidence of corrupt intent is at its highest.[1]

---

[1] Let me be explicit. I am not impressed with the testimony of subordinate officers that their superior officer exercised his discretion in "unusual" ways. The nature of discretion is that it may be exercised in different ways at different times, often without explanation. Thus, the person with the discretion to enforce the police department's dress code may choose to enforce it rigidly without giving up his discretion to relax it in a given circumstance. The person with the discretion to assign tasks to subordinates may choose to follow a rotation without giving up the discretion to assign out of rotation in a given circumstance. The person with the discretion to direct investigations may allow subordinates the freedom to direct investigations without giving up the discretion to direct a specific investigation. Moreover, in a hierarchical, paramilitary organization like a police department, we are largely not concerned about inferior officers's views on their superior's discretionary choices. The only thing that would bring these actions out of the ordinary

My colleagues and I agree that the State bore the burden of producing evidence beyond a reasonable doubt of corrupt intent. Slip Op. at 28. We disagree, however, about what that proof must look like. The majority thinks it is sufficient that the State offered four "unusual" behaviors by Sewell and left it to the jury to decide if each of these (or all of them cumulatively) reflected a corrupt intent or "a mere error of judgment." Slip Op. at 39-43. In my view, the State has proven nothing about Sewell's actual intent but has instead left the entire question to jury speculation without any factual basis. This is, in my view, erroneous because when the existence of Sewell's corrupt intent is just as probable as its nonexistence, the conclusion that it exists is just speculation. *Brown v. State*, 182 Md. App. 138, 173 (2008); *see also Bible*, 411 Md. at 157.

For each of the four "unusual" behaviors to which my colleagues point, Slip Op. at 34-35, there are three equally likely, absolutely unproven species of intent discussed below: a *good intent*, a *bad intent*, and a *corrupt intent*; only one of which is consistent with conviction. *See* Slip Op. at 29 (citing *Bevard v. Hoffman*, 18 Md. 479, 483 (1862) (noting that a public officer is not liable "for the consequences of mistakes honestly made."). Because any of the three species of intent might be evidenced by the same "unusual" behavior, and each is equally likely, it is my view that the State has failed to prove any intent at all, let alone a corrupt one. Moreover, because nothing plus nothing equals

---

exercise of the chief's discretion would be the only thing missing from the State's case: evidence of corrupt intent.

3

nothing, I reject the idea that the State's evidence cumulatively is more than the sum of its parts. Slip Op. at 41 n.12.

## A.

*First*, the majority reports that Sewell appeared at the scene dressed in plain clothes rather than in uniform. Slip Op. at 34. McGlotten described this behavior by Sewell as "unusual." Slip Op. at 5-6; 14-15. Sewell's sartorial selections could equally likely reflect a good, a bad, or a corrupt intent. The *good intent* would be that Sewell was dressed in plain clothes at the time he learned of the incident and prioritized swift arrival over changing clothes and putting on his uniform. The *bad intent* would be that the chief of the police department presented himself in an unprofessional manner at the scene of an official incident. Finally, the *corrupt intent* would be that Sewell raced to the scene of a crime so that he could minimize or avoid enforcement of the law on Matthews. The State made none of these explanations more likely than any other, however, leaving the jury to speculate as to why Sewell was out of uniform.

## B.

*Second*, the majority reports that Sewell reassigned primary responsibility for investigating the incident from McGlotten to Barnes. Slip Op. at 34. McGlotten testified that he wasn't pleased that the case was reassigned to Barnes and that the typical practice was that once an officer began an investigation, that same officer would finish it. Thus, it was McGlotten's view that the reassignment was "unusual." Slip Op. at 14.

Remember, the incident occurred in the north sector of Pocomoke City and, in the ordinary course, should have been assigned to Barnes who was assigned to patrol the north

4

sector. Slip Op. at 4-5. Because of events that evening, however, McGlotten was preliminarily assigned primary responsibility. *Id*. Sewell then reassigned that responsibility to Barnes. Slip Op. at 17. Both McGlotten and Barnes testified that this was "unusual." Slip Op. at 41.

Any of the three species of intent is equally likely here as well. The *good intent* might be that Sewell reassigned the matter to equalize workloads, to give Barnes greater experience, or as a reward for good conduct or a punishment for bad. It would reflect *bad intent* if Sewell misunderstood the rotation, preferred one officer to the other, or was just being a jerk. It would only show a *corrupt intent* if Sewell reassigned the investigation because he believed that he could more easily manipulate Barnes into reaching an outcome favorable to Matthews. Here, again, the State did nothing to demonstrate why one of these categories was more likely than any of the others.

C.

*Third*, the majority reports Sewell answered Barnes's questions about Matthews's sobriety on Matthews's behalf. Slip Op. at 35. Specifically, the majority notes that Barnes testified at trial that "when she asked Matthews if he had been drinking or was impaired by medication, and why he left the scene of the accident, Sewell answered for Matthews the two times she asked Matthews these direct questions." Slip Op. at 17-18. Barnes testified that this series of events was "unusual." Slip Op. at 42.

Again, the State did nothing to prove that any species of intent was anymore likely than any other. It would have evidenced a *good intent* if Sewell answered for Matthews because he had made a correct and independent determination that Matthews was sober

5

and scared, but not intoxicated. It would have evidenced a *bad intent* if unbeknownst to Sewell, Matthews was intoxicated and Sewell made an honest but incorrect determination of his sobriety. It would have evidenced a *corrupt intent* only if Sewell knew Matthews was intoxicated but contrived his conclusions and imposed them on his subordinate officers to "fix" the investigation for Matthews's benefit. Here too, the State failed to show that any one of these scenarios was more likely than another.

D.

*Fourth*, the majority reports Sewell instructed Barnes to write the incident up as an "accident" instead of, presumably, as a "hit and run." Slip Op. at 35. I think by this, my colleagues mean that Sewell should have allowed Barnes to make the decision of whether to charge Matthews with leaving the scene of an accident. Md. Code, Transp. ("TR") §§ 20-103, *et seq.* Instead, Barnes testified at trial that Sewell instructed her "to write it as an accident report" on the basis that the incident "wasn't a hit and run, and that the driver of the vehicle was not intoxicated or impaired." Slip. Op. at 18. This was, as Barnes testified, unusual. Slip Op. at 18.

Sewell might have limited the investigation in the manner described with good intent, bad intent, or corrupt intent, but could only be convicted if the State produced evidence of corrupt intent. On this point, a *good intent* would be if Sewell told Barnes not to cite Matthews for leaving the scene because he thought that Matthews had satisfied his obligation by reporting the incident to Lieutenant Greene. TR §20-104(d) (specifying that if no police officer is present to receive a police report, a driver involved in an accident may satisfy the obligation and avoid criminal liability by immediately notifying the

6

"nearest office of an authorized police authority"). A *bad intent* (but not illegal intent) would be if Sewell incorrectly concluded that TR §20-104(d) had been satisfied. It would only reflect a *corrupt intent* if Sewell intended to "fix" the investigation by directing Barnes to report a crime as an accident. Here, again, the State did not offer anything to show that any intent was more likely than any other, thus leaving the jury to speculate.

## II.

Because I would find that the State failed to satisfy its burden of providing sufficient evidence that Sewell acted with corrupt intent in connection with the investigation of the Matthews incident, I would hold that the circuit court erred in denying Sewell's motions for judgment of acquittal, reverse the conviction for misconduct in office, and hold that the State is barred, by principles of double jeopardy, from retrying Sewell for this crime. I most respectfully dissent.

7